# UTAH ET AL. *v.* EVANS, SECRETARY OF COMMERCE, ET AL.

No. 01–714.  Argued March 27, 2002—Decided June 20, 2002

454

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SOUTER, and GINSBURG, JJ., joined, and in which O'CONNOR, J., joined as to Parts I and II. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 479. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY, J., joined, *post*, p. 488. SCALIA, J., filed a dissenting opinion, *post*, p. 510.

*Thomas R. Lee* argued the cause for appellants. With him on the briefs were *Carter G. Phillips, Gene C. Schaerr, Michael S. Lee, Mark L. Shurtleff,* Attorney General of Utah, *Raymond A. Hintze,* Chief Civil Deputy Attorney General, and *J. Mark Ward,* Assistant Attorney General.

*Walter Dellinger* argued the cause for appellees North Carolina et al. With him on the brief were *Jonathan D. Hacker, Roy Cooper,* Attorney General of North Carolina, and *James Peeler Smith* and *Tiare B. Smiley,* Special Deputy Attorneys General.

*Solicitor General Olson* argued the cause for the federal appellees. With him on the brief were *Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Malcolm L. Stewart, Mark B. Stern,* and *Jonathan H. Levy.**

---

*\*Valle Simms Dutcher* and *L. Lynn Hogue* filed a brief for the Southeastern Legal Foundation, Inc., as *amicus curiae* urging reversal.

*Nancy Northup* and *Deborah Goldberg* filed a brief for the Brennan Center for Justice at NYU School of Law as *amicus curiae* urging affirmance.

JUSTICE BREYER delivered the opinion of the Court.

The question before us is whether the Census Bureau's use in the year 2000 census of a methodology called "hot-deck imputation" either (1) violates a statutory provision forbidding use of "the statistical method known as 'sampling'" or (2) is inconsistent with the Constitution's statement that an "actual Enumeration" be made. 13 U. S. C. § 195; U. S. Const., Art. I, § 2, cl. 3. We conclude that use of "hot-deck imputation" violates neither the statute nor the Constitution.

## I

## A

"Hot-deck imputation" refers to the way in which the Census Bureau, when conducting the year 2000 census, filled in certain gaps in its information and resolved certain conflicts in the data. The Bureau derives most census information through reference to what is, in effect, a nationwide list of addresses. It sends forms by mail to each of those addresses. If no one writes back or if the information supplied is confusing, contradictory, or incomplete, it follows up with several personal visits by Bureau employees (who may also obtain information on addresses not listed). Occasionally, despite the visits, the Bureau will find that it still lacks adequate information or that information provided by those in the field has somehow not been integrated into the master list. The Bureau may have conflicting indications, for example, about whether an address on the list (or a newly generated address) represents a housing unit, an office building, or a vacant lot; about whether a residential building is vacant or occupied; or about the number of persons an occupied unit contains. These conflicts and uncertainties may arise because no one wrote back, because agents in the field produced confused responses, or because those who processed the responses made mistakes. There may be too little time left for further personal visits. And the Bureau may then de-

cide "imputation" represents the most practical way to resolve remaining informational uncertainties.

The Bureau refers to different kinds of "imputation" depending upon the nature of the missing or confusing information. Where, for example, the missing or confused information concerns the existence of a housing unit, the Bureau speaks of *"status imputation."* Where the missing or confused information concerns whether a unit is vacant or occupied, the Bureau speaks of *"occupancy imputation."* And where the missing or confused information concerns the number of people living in a unit, the Bureau refers to *"household size imputation."* In each case, however, the Bureau proceeds in a somewhat similar way: It imputes the relevant information by inferring that the address or unit about which it is uncertain has the same population characteristics as those of a "nearby sample or 'donor'" address or unit—*e. g.,* its "geographically closest neighbor of the same type (*i. e.,* apartment or single-family dwelling) that did not return a census questionnaire" by mail. Brief for Appellants 7–8, 11. Because the Bureau derives its information about the known address or unit from the current 2000 census rather than from prior censuses, it refers to its imputation as "hot-deck," rather than "cold-deck," imputation.

These three forms of imputation increased the final year 2000 count by about 1.2 million people, representing 0.4% of the total population. But because this small percentage was spread unevenly across the country, it makes a difference in the next apportionment of congressional Representatives. In particular, imputation increased North Carolina's population by 0.4% while increasing Utah's population by only 0.2%. And the parties agree that that difference means that North Carolina will receive one more Representative, and Utah will receive one less Representative, than if the Bureau had not used imputation but instead had simply filled relevant informational gaps by counting the related number of individuals as zero.

## B

After analyzing the census figures, Utah brought this lawsuit against the Secretary of Commerce and the Acting Director of the Census Bureau, the officials to whom the statutes delegate authority to conduct the census. 28 U. S. C. § 2284. Utah claimed that the Bureau's use of "hot-deck imputation" violates the statutory prohibition against use of "the statistical method known as 'sampling,'" 13 U. S. C. § 195, and is inconsistent with the Constitution's statement that an "actual Enumeration" be made, Art. I, § 2, cl. 3. Utah sought an injunction compelling the census officials to change the official census results. North Carolina intervened. The District Court found in the Census Bureau's favor. 182 F. Supp. 2d 1165 (Utah 2001). Utah appealed. 28 U. S. C. § 1253. And we postponed consideration of jurisdiction pending hearing the case on the merits. 534 U. S. 1112 (2002).

## II

North Carolina argues at the outset that the federal courts lack the constitutional power to hear this case. Article III, § 2, of the Constitution extends the "judicial Power" of the United States to actual "Cases" and "Controversies." A lawsuit does not fall within this grant of judicial authority unless, among other things, courts have the power to "redress" the "injury" that the defendant allegedly "caused" the plaintiff. *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 561 (1992); *Allen* v. *Wright,* 468 U. S. 737, 751 (1984). And, in North Carolina's view, the courts cannot "redress" the injury that Utah claims to have suffered here. Hence Utah does not have the "standing" that the Constitution demands.

In *Franklin* v. *Massachusetts,* 505 U. S. 788 (1992), this Court considered, and rejected, a similar claim. A private plaintiff had sued the Secretary of Commerce, challenging the legality of a 1990 census counting method as "arbitrary and capricious" and contrary to certain specific statutes.

*Id.,* at 790–791. That plaintiff sought to require the Secretary to recalculate the numbers and recertify the official results. The plaintiff hoped that would ultimately lead to a reapportionment that would assign an additional Representative to his own State.

Eight Members of the Court found that the plaintiff had standing. Four Justices considered only whether the law permitted courts to review Census Bureau decisions under the Administrative Procedure Act. They concluded that it did. And they saw no further standing obstacle. *Id.,* at 807 (STEVENS, J., concurring in part and concurring in judgment).

Four other Justices went further. They found that the controversy between the plaintiff and the Secretary was concrete and adversary. They said:

> "The Secretary certainly has an interest in defending her policy determinations concerning the census; even though she cannot herself change the reapportionment, she has an interest in litigating its accuracy." *Id.,* at 803 (opinion of O'CONNOR, J.).

They also found that, as a practical matter, redress seemed likely. They said:

> "[A]s the Solicitor General has not contended to the contrary, we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision . . . even though they would not be directly bound by such a determination." *Ibid.*

They saw no further potential obstacle to standing. *Ibid.*

We can find no significant difference between the plaintiff in *Franklin* and the plaintiff (Utah) here. Both brought their lawsuits after the census was complete. Both claimed that the Census Bureau followed legally improper counting methods. Both sought an injunction ordering the Secretary

of Commerce to recalculate the numbers and recertify the official result. Both reasonably believed that the Secretary's recertification, as a practical matter, would likely lead to a new, more favorable, apportionment of Representatives. Given these similarities, North Carolina must convince us that we should reconsider *Franklin.* It has not done so.

North Carolina does not deny that the courts can order the Secretary of Commerce to recalculate the numbers and to recertify the official census result. Rather it points out that Utah suffers, not simply from the lack of a proper census "report" (a document), but more importantly from the lack of the additional congressional Representative to which North Carolina believes itself entitled as a consequence of the filing of that document. Whatever we may have said in *Franklin,* North Carolina argues, court-ordered relief simply cannot reach beyond the "report" and, here, a proper "report" cannot help bring about that ultimate "redress."

The reason North Carolina believes that court-ordered relief, *i. e.,* the new document, cannot help is that, in its view, the statutes that set forth the census process make ultimate redress legally impossible. Those statutes specify that the Secretary of Commerce must "take a decennial census of population as of the first day of April" 2000, 13 U. S. C. § 141(a); he must report the results to the President by January 1, 2001, § 141(b); the President must transmit to Congress by January 12, 2001, a statement showing the "whole number of persons in each State . . . and the number of Representatives to which each State would be entitled," 2 U. S. C. § 2a(a); and, within 15 days of receiving that statement, the Clerk of the House of Representatives must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled," § 2a(b). The statutes also say that, once all that is done, each State "shall be entitled" to the number of Representatives that the "certificate" specifies "until the taking effect of a reapportionment under this section or subsequent statute." *Ibid.*

North Carolina points out that all of this was done by January 16, 2001. And North Carolina concludes that it is "entitled" to the number of Representatives that the "certificate" specifies (*i. e.*, one more than Utah would like)—come what may.

We disagree with North Carolina because we do not read these statutes so absolutely—as if they barred a certificate's revision in all cases no matter what. The statutes themselves do not expressly say what is to occur should the "report" or the "statement" upon which the Clerk's "certificate" rests turn out to contain, or to reflect, a serious mistake. The language is open to a more flexible reading that would permit correction of a certificate found to rest upon a serious error—say, a clerical, a mathematical, or a calculation error, in census data or in its transposition. And if that error is uncovered before new Representatives are actually selected, and its correction translates mechanically into a new apportionment of Representatives without further need for exercise of policy judgment, such mechanical revision makes good sense. In such cases, the "certificate" previously sent would have turned out not to have been a proper or valid certificate, it being understood that these statutes do not bar the substitution of a newer, more accurate version. Guided by *Franklin*, which found standing despite the presence of this statute, we read the statute as permitting "certificate" revision in such cases of error, and we include among them cases of court-determined legal error leading to a court-required revision of the underlying Secretarial "report." So read, the statute poses no legal bar to "redress."

North Carolina adds that another statute, enacted after *Franklin*, nonetheless bars our consideration of this case. That statute authorizes "[a]ny person aggrieved by the use of any [unlawful] statistical method" to bring "a civil action" for declaratory or injunctive "relief against the use of such method." Pub. L. 105–119, Title II, § 209(b), 111 Stat. 2481. North Carolina argues that this statute, by directly authoriz-

ing a lawsuit *prior to* conclusion of the census, implicitly forbids a lawsuit *after* its conclusion. And it supports this reading by pointing to a legislative finding that it would "be impracticable" to provide relief "after" that time. *Id.*, § 209(a)(8).

This statute, however, does not say that it bars postcensus lawsuits. It does not explain why Congress would have wished to deprive of its day in court a State that did not learn about a counting method's representational consequences until after the census is complete—and hence had little, if any, incentive to bring a precensus action. Nor (as we have just explained), if a lawsuit is brought soon enough after completion of the census and heard quickly enough, is relief necessarily "impracticable." We read limitations on our jurisdiction to review narrowly. See *Webster* v. *Doe*, 486 U. S. 592, 603 (1988); see also *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670 (1986). But see *National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers*, 414 U. S. 453 (1974) (special circumstances warrant reading statute as limiting the persons authorized to bring suit). We do not normally read into a statute an unexpressed congressional intent to bar jurisdiction that we have previously exercised. *Franklin; Department of Commerce* v. *Montana*, 503 U. S. 442 (1992). And we shall not do so here.

Neither statute posing an absolute legal barrier to relief, we believe it likely that Utah's victory here would bring about the ultimate relief that Utah seeks. Victory would mean a declaration leading, or an injunction requiring, the Secretary to substitute a new "report" for the old one. Should the new report contain a different conclusion about the relative populations of North Carolina and Utah, the relevant calculations and consequent apportionment-related steps would be purely mechanical; and several months would remain prior to the first post-2000 census congressional election. Under these circumstances, it would seem,

as in *Franklin,* "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision . . . ." 505 U. S., at 803 (opinion of O'CONNOR, J.).

Moreover, in terms of our "standing" precedent, the courts would have ordered a change in a legal status (that of the "report"), and the practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered. We have found standing in similar circumstances. See, *e. g., Federal Election Comm'n* v. *Akins,* 524 U. S. 11, 25 (1998) (standing to obtain court determination that the organization was a "political committee" where that determination would make agency more likely to require reporting, despite agency's power not to order reporting regardless); *Bennett* v. *Spear,* 520 U. S. 154, 169–171 (1997) (similar in respect to determination of the lawfulness of an agency's biological report); *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.,* 501 U. S. 252, 264–265 (1991) (similar in respect to determination that transfer of airport control to local agency is unlawful). And related cases in which we have denied standing involved a significantly more speculative likelihood of obtaining ultimate relief. See *Lujan,* 504 U. S., at 564–565, n. 2 (obtaining ultimate relief "speculative"); *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 42 (1976) (same). We consequently conclude that Utah has standing here, and we have jurisdiction.

## III

Utah rests its statutory claim on a federal sampling statute which reads as follows:

"Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he con-

siders it feasible, authorize the use of the statistical method known as 'sampling' . . . ." 13 U. S. C. § 195.

We have previously read this language as forbidding apportionment-related use of "the statistical method known as 'sampling.'" *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 343 (1999). Utah claims that imputation, as practiced by the Census Bureau, is a form of that forbidden "sampling" method.

The Government argues that imputation is not "sampling." And it has used a simplified example to help explain why this is so. Imagine a librarian who wishes to determine the total number of books in a library. If the librarian finds a statistically sound way to select a sample (*e. g.*, the books contained on every 10th shelf) and if the librarian then uses a statistically sound method of extrapolating from the part to the whole (*e. g.*, multiplying by 10), then the librarian has determined the total number of books by using the statistical method known as "sampling." If, however, the librarian simply tries to count every book one by one, the librarian has not used sampling. Nor does the latter process suddenly become "sampling" simply because the librarian, finding empty shelf spaces, "imputes" to that empty shelf space the number of books (currently in use) that likely filled them—not even if the librarian goes about the imputation process in a rather technical way, say, by measuring the size of nearby books and dividing the length of each empty shelf space by a number representing the average size of nearby books on the same shelf.

This example is relevant here both in the similarities and in the differences that it suggests between sampling and imputation. In both, "'information on a portion of a population is used to infer information on the population as a whole.'" Brief for Appellants 18. And in Utah's view, and that of JUSTICE O'CONNOR, see *post*, at 482–483 (opinion concurring in part and dissenting in part), that similarity brings

the Census Bureau imputation process within the relevant statutory phrase.

On the other hand, the two processes differ in several critical respects: (1) In respect to the *nature of the enterprise,* the librarian's sampling represents an overall approach to the counting problem that from the beginning relies on data that will be collected from only a part of the total population, Declaration of Howard Hogan ¶¶ 19–23, App. 257–259 (hereinafter Hogan); (2) in respect to *methodology,* the librarian's sampling focuses on using statistically valid sample-selection techniques to determine what data to collect, ¶¶ 29–30, *id.,* at 261–262; Declaration of Joseph Waksberg ¶¶ 6, 10, *id.,* at 290–294 (hereinafter Waksberg); and (3) in respect to *the immediate objective,* the librarian's sampling seeks immediately to extrapolate the sample's relevant population characteristics to the whole population, Hogan ¶ 30, *id.,* at 262; Declaration of David W. Peterson ¶ 8, *id.,* at 352 (hereinafter Peterson).

By way of contrast, the librarian's imputation (1) does not represent an overall approach to the counting problem that will rely on data collected from only a subset of the total population, since it is a method of *processing* data (giving a value to missing data), not its collection, ¶¶ 21, 29, *id.,* at 257–258, 261–262; it (2) does not rely upon the same statistical methodology generally used for sample selection, U. S. Dept. of Commerce, Decennial Statistical Studies Division, Census 2000 Procedures and Operations, Memorandum Series B–17, Feb. 28, 2001, *id.,* at 194–196; Waksberg ¶¶ 6, 10, *id.,* at 290, 293–294; and it (3) has as its immediate objective determining the characteristics of missing individual books, not extrapolating characteristics from the sample to the entire book population, Hogan ¶ 17, *id.,* at 256–257; Peterson ¶ 9, *id.,* at 352.

These same differences distinguish Bureau imputation in the year 2000 census from "the statistical method known as 'sampling.'" 13 U. S. C. § 195. The nature of the Bureau's

enterprise was not the extrapolation of the features of a large population from a small one, but the filling in of missing data as part of an effort to count individuals one by one. But cf. *post*, at 482–483 (O'CONNOR, J., concurring in part and dissenting in part) (suggesting the contrary). The Bureau's methodology was not that typically used by statisticians seeking to find a subset that will resemble a whole through the use of artificial, random selection processes; but that used to assure that an individual unit (not a "subset"), chosen nonrandomly, will resemble other individuals (not a "whole") selected by the fortuitous unavailability of data. L. Kish, Survey Sampling 26 (1965) ("In statistical literature [sampling] is generally synonymous with random sampling"). And the Bureau's immediate objective was the filling in of missing data; not extrapolating the characteristics of the "donor" units to an entire population.

These differences, whether of degree or of kind, are important enough to place imputation outside the scope of the statute's phrase "the statistical method known as 'sampling.'" For one thing, that statutory phrase—using the words "known as" and the quotation marks that surround "sampling"—suggests a term of art with a technical meaning. And the technical literature, which we have consequently examined, see *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 201 (1974), contains definitions that focus upon differences of the sort discussed above. One text, for example, says that *"[s]urvey sampling,* or population sampling, deals with methods for selecting and observing a part (sample) of the population in order to make inferences about the whole population." Kish, *supra*, at 18. Another says that "sample, as it is used in the [statistics] literature . . . means a subset of the population that is used to gain information about the entire population," G. Henry, Practical Sampling 11 (1990), or, in other words, "a model of the population," *ibid.* Yet another says that a "sampling method is a method of selecting a fraction of the population in a way that the selected sample

represents the population." P. Sukhatme, Sampling Theory of Surveys with Applications 1 (1954). A 1953 treatise, to which Utah refers, says that a broader definition of "sample" is imprecise, adding that the term "should be reserved for a set of units . . . which has been selected in the belief that it will be representative of the whole aggregate." F. Yates, Sampling Methods for Censuses and Surveys § 1.1, p. 2 (2d rev. ed. 1953) (hereinafter Yates). And Census Bureau documents state that "professional statisticians" reserve the term " 'sample' . . . for instances when the selection of the smaller population is based on the methodology of their science." Report to Congress—The Plan for Census 2000, p. 23 (revised and reissued Aug. 1997) (hereinafter Report to Congress).

These definitions apply easily and naturally to what we called "sampling" in the librarian example, given its nature, methods, and immediate objectives. These definitions do not apply to the librarian's or to the Bureau's imputation process—at least not without considerable linguistic squeezing.

For another thing, Bureau statisticians testified in the District Court that, in their expert opinion, Bureau imputation was not "sampling" as that term is used in the field of statistics. Hogan ¶¶ 18–30, App. 257–262; Waksberg ¶¶ 6–10, *id.,* at 290–294 (former Bureau statistician). Their reasons parallel those to which we have referred. *Ibid.* Although Utah presented other experts who testified to the contrary, Utah has not relied upon their testimony or expert knowledge here. Insofar as the parties now rely on expert opinion, that opinion uniformly favors the Government.

Further, the history of the sampling statute suggests that Congress did not have imputation in mind in 1958 when it wrote that law. At that time, the Bureau already was engaged in what it called "sampling," a practice that then involved asking a small subset of the population subsidiary census questions about, say, automobiles, telephones, or dish-

washers, and extrapolating the responses to produce national figures about, say, automobile ownership. See M. Anderson, The American Census: A Social History 199 (1988) (discussing "long form" survey, sent in 1950 to about 20% of population). The Secretary of Commerce asked Congress to enact a law that would make clear the Bureau had legal authority to engage in this "practice." Amendment of Title 13, United States Code, Relating to Census: Hearing on H. R. 7911 before the House Committee on the Post Office and Civil Service, 85th Cong., 1st Sess., 7 (1957) (Statement of Purpose and Need) (Secretary of Commerce, describing Bureau's ability to obtain "some . . . information . . . efficiently through a sample survey . . . rather than a complete enumeration basis"). The Secretary did not object to a legislative restriction that would, in effect, deny the Bureau sampling authority in the area of apportionment. And Congress, in part to help achieve cost savings, responded with the present statute which provides that limited authority. See S. Rep. No. 698, 85th Cong., 1st Sess., 3 (1957) ("[P]roper use of sampling methods can result in substantial economies in census taking"); S. Rep. No. 94–1256, p. 5 (1976) ("use of sampling procedures and surveys . . . urged for the sake of economy and reducing respondent burden").

This background suggests that the "sampling" to which the statute refers is the practice that the Secretary called "sampling" at the time—for that is what Congress considered. And it suggests that the statutory word does not apply to imputation—for that is a matter that Congress did not consider. Indeed, had the Secretary believed that Congress intended to restrict the Bureau's authority to engage in apportionment-related imputation, he would likely have expressed an objection, for the Bureau had used such imputation in the past and intended to use it in the future. Hogan ¶ 39, App. 266–267. Moreover, the Bureau's rationale for using sampling was quite different from its rationale for using imputation. An advance plan to sample a subset saves

money, for it restricts a survey's potential scope. Bureau imputation does not save money, for the Bureau turns to imputation only after ordinary questionnaires and interviews have failed. Rather, imputation reflects a Bureau decision to spend at least a small amount of additional money in order to avoid placing the figure "zero" next to a listed address when it is possible to do better. See ¶ 34, *id.*, at 264 ("The goal in Census 2000 was to conduct a census that was both numerically and distributively accurate").

Finally, Utah provides no satisfactory alternative account of the meaning of the phrase "the statistical method known as 'sampling.'" Its arguments suggest that the phrase should apply to any use of statistics that would help the Bureau extrapolate from items about which the Bureau knows to other items, the characteristics of which it does not know. Brief for Appellants 9. But that definitional view would include within the statutory phrase matters that could not possibly belong there—for example, the use of statistics to determine whether it is better to ask a postal worker or a neighbor about whether an apparently empty house is occupied. And it would come close to forbidding the use of all statistics, not simply one statistical method ("sampling"). Utah's express definitional statement—that "sampling" occurs whenever "information on a portion of a population is used to infer information on the population as a whole"— suffers from a similar defect. Indeed, it is even broader, coming close to a description of the mental process of inference itself. While the Census Bureau and at least one treatise have used somewhat similar language to define "sampling," they have immediately added the qualification that such is the "layman's" view, while professional statisticians, when speaking technically, speak more narrowly and more precisely. Report to Congress 23; Yates 1–2.

Utah makes several additional arguments. It says that in *House of Representatives,* the Court found that two methods, virtually identical to imputation, constituted "sampling."

It says that the Bureau, if authorized to engage in imputation, might engage in wide-scale substitution of imputation for person-by-person counting. And it says that, in any event, the Bureau's methods for imputing *status* and *occupancy*, see *supra*, at 458, are inaccurate.

In our view, however, *House of Representatives* is distinguishable. The two instances of Bureau methodology at issue there satisfied the technical criteria for "sampling" in ways that the imputation here at issue does not. In both instances, the Bureau planned at the outset to produce a statistically sound sample from which it extrapolated characteristics of an entire population. In the first instance it did so by selecting census blocks randomly from which to extrapolate global census figures in order to compare (and adjust) the accuracy of figures obtained in traditional ways with figures obtained through statistical sampling. 525 U. S., at 325–326. In the second instance it used a sample drawn from questionnaire nonrespondents in particular census tracts in order to obtain the population figure for the entire tract. The "sampling" in the second instance more closely resembles the present effort to fill in missing data, for the "sample" of nonrespondents was large (about 20% of the tract) compared to the total nonresponding population (about 30% of the entire tract). *Id.*, at 324–325. Nonetheless, we believe that the Bureau's view of the enterprise as sampling, the deliberate decision taken in advance to find an appropriate sample, the sampling methods used to do so, the immediate objective of determining through extrapolation the size of the entire nonresponding population, and the quantitative figures at issue (10% of the tract there; 0.4% here), all taken together, distinguish it—in degree if not in kind—from the imputation here at issue.

Nor are Utah's other two arguments convincing. As to the first, Utah has not claimed that the Bureau has used imputation to manipulate results. It has not explained how census-taking that fills in ultimate blanks through imputa-

tion is more susceptible to manipulation than census-taking that fills in ultimate blanks with a zero. And given the advance uncertainties as to which States imputation might favor, manipulation would seem difficult to arrange. If JUSTICE O'CONNOR's speculation comes to pass—that the Bureau would decide, having litigated this case and utilized imputation in a subsequent census, to forgo the benefits of that process because of its results—the Court can address the problem at that time. As to the second, Utah's claim concerns the nature of the imputation method, not its accuracy as applied—though we add that neither the record, see *infra*, at 477, nor JUSTICE O'CONNOR's opinion, see *post*, at 487–488, gives us any reason to doubt that accuracy here.

We note one further legal hurdle that Utah has failed to overcome—the Bureau's own interpretation of the statute. The Bureau, which recommended this statute to Congress, has consistently, and for many years, interpreted the statute as permitting imputation. Hogan ¶¶ 39, 41, 43, 46, 47, 52, App. 266–273. Congress, aware of this interpretation, has enacted related legislation without changing the statute. See, *e. g.*, Census Address List Improvement Act of 1994, Pub. L. 103–430, 108 Stat. 4393; Foreign Direct Investment and International Financial Data Improvements Act of 1990, Pub. L. 101–533, 104 Stat. 2344; Act of Oct. 14, 1986, Pub. L. 99–467, 100 Stat. 1192. (Indeed, the Bureau told Congress of its planned use of imputation in the year 2000 census without meeting objection.) And the statute itself delegates to the Secretary the authority to conduct the decennial census "in such form and content as he may determine." 13 U. S. C. § 141(a). Although we do not rely on it here, under these circumstances we would grant legal deference to the Bureau's own legal conclusion were that deference to make the difference. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984).

In sum, imputation differs from sampling in respect to the nature of the enterprise, the methodology used, and the im-

mediate objective sought. And as we have explained, these differences are of both kind and degree. That the differences may be of degree does not lessen their significance where we are charged with interpreting statutory language and we are faced with arguments that suggest that it covers even the most ordinary of inferences. Since that cannot be so, we have found the keys to understanding the operative phrase in its history: the fact that the Bureau itself believed imputation to stand outside the prohibition it requested Congress pass, the fact that the Bureau has consistently used imputation, and the fact that Congress, on notice of that use, has not suggested otherwise. For these reasons, we conclude that the statutory phrase "the statistical method known as 'sampling'" does not cover the Bureau's use of imputation.

## IV

Utah's constitutional claim rests upon the words "actual Enumeration" as those words appear in the Constitution's Census Clause. That Clause, as changed after the Civil War (in ways that do not matter here), reads as follows:

> "Representatives and direct Taxes shall be apportioned among the several States . . . according to their respective Numbers . . . counting the whole number of persons in each State. . . . The *actual Enumeration* shall be made within three Years after the first Meeting of the Congress of the United States, . . . in such Manner as they shall by Law direct." Art. I, §2, cl. 3 (emphasis added); see also Amdt. 14, §2.

Utah argues that the words "actual Enumeration" require the Census Bureau to seek out each individual. In doing so, the Bureau may rely upon documentary evidence that an individual exists, say, a postal return, or upon eyewitness evidence, say, by a census taker. It can fill in missing data through the use of testimonial reports, including secondhand or thirdhand reports, made by a family member, neighbor,

or friend. But it may not rely upon imputation, which fills in data by assuming, for example, that an unknown house has the same population characteristics as those of the closest similar house nearby.

We do not believe the Constitution makes the distinction that Utah seeks to draw. The Constitution's text does not specify any such limitation. Rather, the text uses a general word, "enumeration," that refers to a counting process without describing the count's methodological details. The textual word "actual" refers in context to the enumeration that will be used for apportioning the Third Congress, succinctly clarifying the fact that the constitutionally described basis for apportionment will not apply to the First and Second Congresses. The final part of the sentence says that the "actual Enumeration" shall take place "in such Manner as" Congress itself "shall by Law direct," thereby suggesting the breadth of congressional methodological authority, rather than its limitation. See, e. g., *Wisconsin* v. *City of New York*, 517 U. S. 1, 19 (1996).

The history of the constitutional phrase supports our understanding of the text. The Convention sent to its Committee of Detail a draft stating that Congress was to "regulate the number of representatives by the number of inhabitants, . . . which number shall . . . be taken in such manner as . . . [Congress] shall direct." 2 M. Farrand, Records of the Federal Convention of 1787, pp. 178, 182–183 (rev. ed. 1966) (hereinafter Farrand). After making minor, here irrelevant, changes, the Committee of Detail sent the draft to the Committee of Style, which, in revising the language, added the words "actual Enumeration." *Id.*, at 590, 591. Although not dispositive, this strongly suggests a similar meaning, for the Committee of Style "had no authority from the Convention to alter the meaning" of the draft Constitution submitted for its review and revision. *Powell* v. *McCormack*, 395 U. S. 486, 538–539 (1969); see 2 Farrand 553; see also *Nixon* v. *United States*, 506 U. S. 224, 231 (1993).

Hence, the Framers would have intended the current phrase, "the actual Enumeration shall be made . . . in such Manner as [Congress] . . . shall by Law direct," as the substantive equivalent of the draft phrase, "which number [of inhabitants] shall . . . be taken in such manner as [Congress] shall direct." 2 Farrand 183. And the Committee of Style's phrase offers no linguistic temptation to limit census methodology in the manner that Utah proposes.

Moreover, both phrases served to distinguish the census from the process of apportionment for the first Congress. Read in conjunction with the proceedings of the Constitutional Convention, the text of Article I makes clear that the original allocation of seats in the House was based on a kind of "conjectur[e]," 1 id., at 578–579, in contrast to the deliberately taken count that was ordered for the future. U. S. Const., Art. I, § 2, cl. 3; 1 Farrand 602; 2 id., at 106; 2 The Founders' Constitution 135–136, 139 (P. Kurland & R. Lerner eds. 1987) (hereinafter Kurland & Lerner); see also *Department of Commerce*, 503 U. S., at 448, and n. 15; *post*, at 498–500 (THOMAS, J., concurring in part and dissenting in part) (describing colonial estimates). What was important was that contrast—rather than the particular phrase used to describe the new process.

Contemporaneous general usage of the word "enumeration" adds further support. Late-18th-century dictionaries define the word simply as an "act of numbering or counting over," without reference to counting methodology. 1 S. Johnson, A Dictionary of the English Language 658 (4th rev. ed. 1773); N. Bailey, An Etymological English Dictionary (26th ed. 1789) ("numbering or summing up"); see also Webster's Third New International Dictionary 759 (1961 ed.) ("the act of counting," "a count of something (as a population)"). Utah's strongest evidence, a letter from George Washington contrasting a population "estimate" with a "census" or "enumeration," does not demonstrate the contrary, for one can indeed contrast, say, a rough estimate with an

enumeration, without intending to encompass in the former anything like the Bureau's use of imputation to fill gaps or clarify confused information about individuals. 31 Writings of George Washington 329 (J. Fitzpatrick ed. 1931); see 8 Writings of Thomas Jefferson 236 (A. Lipscomb ed. 1903) (comparing the "actual returns" with "conjectures"); 1 Farrand 602; 2 *id.*, at 106; Kurland & Lerner 135–136. And the evidence JUSTICE THOMAS sets forth, *post*, at 498–500 (opinion concurring in part and dissenting in part), demonstrates the same. The kinds of estimates to which his sources refer are those based on "the number of taxable polls, or the number of the militia." *Post*, at 494 (internal quotation marks omitted). Such sources show nothing other than that "enumeration" may be "incompatible (or at least *arguably* incompatible . . .) with gross statistical estimates," *House of Representatives*, 525 U. S., at 347 (SCALIA, J., concurring in part), but such "gross statistical estimates" are not at stake here.

Contemporaneous legal documents do not use the term "enumeration" in any specialized way. The Constitution itself, in a later article, refers to the words "actual Enumeration" as meaning "Census or Enumeration," Art. I, § 9, cl. 4, thereby indicating that it did not intend the term "actual Enumeration" as a term of art requiring, say, contact (directly or through third parties) between a census taker and each enumerated individual. The First Census Act uses the term "enumeration" almost interchangeably with the phrase "cause the number of the inhabitants . . . to be taken." And the marshals who implemented that Act did not try to contact each individual personally, as they were required only to report the names of all heads of households. Act of Mar. 1, 1790, ch. 2, § 1, 1 Stat. 102. Cf. *House of Representatives, supra,* at 347 (SCALIA, J., concurring in part) (noting that the Census Acts of 1810 through 1950 required census workers to "visit each home in person"); see also *post*, at 504 (THOMAS, J., concurring in part and dissenting in part).

Of course, this last limitation suggests that the Framers expected census enumerators to seek to reach each individual household. And insofar as statistical methods substitute for any such effort, it may be argued that the Framers did not believe that the Constitution authorized their use. See *House of Representatives, supra,* at 346–349 (SCALIA, J., concurring in part). But we need not decide this matter here, for we do not deal with the substitution of statistical methods for efforts to reach households and enumerate each individual. Here the Census Bureau's method is used sparingly only after it has exhausted its efforts to reach each individual, and it does not differ in principle from other efforts used since 1800 to determine the number of missing persons. Census takers have long asked heads of households, "neighbors, landlords, postal workers, or other proxies" about the number of inhabitants in a particular place, Hogan ¶ 11, App. 253. Such reliance on hearsay need be no more accurate, is no less inferential, and rests upon no more of an individualized effort for its inferences than the Bureau's method of imputation.

Nor can Utah draw support from a consideration of the basic purposes of the Census Clause. That Clause reflects several important constitutional determinations: that comparative state political power in the House would reflect comparative population, not comparative wealth; that comparative power would shift every 10 years to reflect population changes; that federal tax authority would rest upon the same base; and that Congress, not the States, would determine the manner of conducting the census. See *Wesberry v. Sanders,* 376 U. S. 1, 9–14, and n. 34 (1964); 1 Farrand 35–36, 196–201, 540–542, 559–560, 571, 578–588, 591–597, 603; 2 *id.,* at 2–3, 106; Kurland & Lerner 86–144; see The Federalist No. 54, pp. 336–341 (C. Rossiter ed. 1961) (J. Madison); *id.,* No. 55, at 341–350 (J. Madison); *id.,* No. 58, at 356–361 (J. Madison); 31 Writings of George Washington, *supra,* at 329. These basic determinations reflect the fundamental na-

ture of the Framers' concerns. Insofar as JUSTICE THOMAS proves that the Framers chose to use population, rather than wealth or a combination of the two, as the basis for representation, *post*, at 500–503, we agree with him. What he does not show, however, is that, in order to avoid bias or for other reasons, they prescribed, or meant to prescribe, the precise method by which Congress was to determine the population. And he cannot show the latter because, for the most part, the choice to base representation on population, like the other fundamental choices the Framers made, are matters of general principle that do not directly help determine the issue of detailed methodology before us. Declaration of Jack N. Rakove in *Department of Commerce* v. *United States House of Representatives*, O. T. 1998, No. 98–404, p. 387 ("What was at issue . . . were fundamental principles of representation itself . . . not the secondary matter of exactly how census data was *[sic]* to be compiled").

Nonetheless, certain basic constitutional choices may prove relevant. The decisions, for example, to use population rather than wealth, to tie taxes and representation together, to insist upon periodic recounts, and to take from the States the power to determine methodology all suggest a strong constitutional interest in accuracy. And an interest in accuracy here favors the Bureau. That is because, as we have said, the Bureau uses imputation only as a last resort— after other methods have failed. In such instances, the Bureau's only choice is to disregard the information it has, using a figure of zero, or to use imputation in an effort to achieve greater accuracy. And Bureau information provided in the District Court suggests that those efforts have succeeded. U. S. Dept. of Commerce, Economics and Statistics Admin., Census 2000 Informational Memorandum No. 110, App. 445–448 (concluding that postcensus research confirms that imputation appropriately included individuals in the census who would otherwise have been excluded).

Of course, the Framers did not consider the imputation process. At the time they wrote the Constitution "statisticks" referred to " 'a statement or view of the civil condition of a people,' " not the complex mathematical discipline it has become. P. Cohen, A Calculating People 150–151 (1982). Yet, however unaware the Framers might have been of specific future census needs, say, of automobiles for transport or of computers for calculation, they fully understood that those future needs might differ dramatically from those of their own times. And they were optimists who might not have been surprised to learn that a year 2000 census of the Nation that they founded required "processed data for over 120 million households, including over 147 million paper questionnaires and 1.5 billion pages of printed material." Hogan ¶ 8, App. 251. Consequently, they did not write detailed census methodology into the Constitution. As we have said, we need not decide here the precise methodological limits foreseen by the Census Clause. We need say only that in this instance, where all efforts have been made to reach every household, where the methods used consist not of statistical sampling but of inference, where that inference involves a tiny percent of the population, where the alternative is to make a far less accurate assessment of the population, and where consequently manipulation of the method is highly unlikely, those limits are not exceeded.

For these reasons the judgment of the District Court is

*Affirmed.*

JUSTICE O'CONNOR, concurring in part and dissenting in part.

In the year 2000 census, the Census Bureau used the statistical technique known as "hot-deck imputation" to calculate the state population totals that were used to apportion congressional Representatives. While I agree with the Court's general description of the imputation process, its conclusion that the appellants have standing to challenge

its use, and its conclusion that we otherwise have jurisdiction to consider that challenge, I would find that the Bureau's use of imputation constituted a form of sampling and thus was prohibited by § 195 of the Census Act, 13 U. S. C. § 1 *et seq.* Therefore, while I concur in Parts I and II of the majority's opinion, I respectfully dissent from Part III and have no occasion to decide whether the Constitution prohibits imputation, which the majority addresses in Part IV.

## I

To conduct the year 2000 census, the Census Bureau (Bureau) first created a master address file that attempted to list every residential housing unit in the United States. See U. S. Dept. of Commerce, Economics and Statistics Admin., Census 2000 Operational Plan VI (Dec. 2000) (hereinafter Census 2000 Operational Plan). The Bureau then conducted a survey of every address on that list, primarily through the use of mail-back questionnaires. See *id.*, at IX.A to IX.E; *ante*, at 457. As relevant here, these questionnaires requested the name of each person living at a given address. See Census 2000 Operational Plan V.B.

Because not every address returned a questionnaire, the Bureau had its enumerators attempt to contact nonresponding addresses up to six times by phone or in person in an effort to obtain population information for each address. See Declaration of Howard Hogan ¶ 73, App. 285 (hereinafter Hogan); Census 2000 Operational Plan IX.G. This was known as "nonresponse followup." *Ibid.* Also during this followup procedure, addresses that appeared vacant were marked as such while addresses determined to be nonexistent were noted for later deletion. See Hogan ¶¶ 69, 73, App. 283, 285. When all followup procedures were completed, the Bureau still lacked population information for approximately 0.4% of the addresses on the master address list because the Bureau had been unable to classify them as either "occupied, vacant, or nonexistent." *Id.*, at 188. Additionally, the

Bureau lacked household size information for approximately 0.2% of addresses that were classified as occupied. See *id.*, at 191.

At this point, the Bureau employed the statistical technique known as "hot-deck imputation." For each unsuccessfully enumerated address, the Bureau imputed population data by copying corresponding data from a " 'donor' " address. *Ante*, at 458. The donor address was the " 'geographically closest neighbor of the same type (*i. e.*, apartment or single-family dwelling) that did not return a census questionnaire' by mail." *Ibid.* (quoting Brief for Appellants 7–8, 11). What this means is that donor addresses were selected only from addresses that had been personally surveyed by the Bureau's enumerators, primarily through the nonresponse followup procedure described above. See App. 156. After imputation was completed, every address on the master address list was associated with a household size number that had been determined either by imputation or by enumeration (although that number was zero for addresses ultimately classified as vacant or nonexistent).

The Bureau used the imputation-adjusted data to calculate state population totals. *Ante*, at 458. Because these totals were used to determine the apportionment of congressional Representatives, *ibid.*, we must determine whether the Bureau's use of imputation constituted a form of sampling. If it did, it was prohibited by § 195 of the Census Act, 13 U. S. C. § 1 *et seq.* See *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 338 (1999).

## II

As initially enacted, § 195 provided that "[e]xcept for the determination of population for apportionment purposes, the Secretary [of Commerce] may, where he deems it appropriate, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title." 13 U. S. C. § 195 (1970 ed.). As relevant here, Congress re-

placed "may, where he deems it appropriate" with "shall, if he considers it feasible" when it amended § 195 in 1976. Pub. L. 94–521, 90 Stat. 2464. In *House of Representatives*, we found that this amended language "might reasonably be read as either permissive or prohibitive with regard to the use of sampling for apportionment purposes." 525 U. S., at 339. Even so, we held that § 195 maintained the prohibition on sampling with respect to apportionment given the "broader context" of "over 200 years during which federal statutes [had] prohibited the use of statistical sampling where apportionment [was] concerned." *Id.*, at 339–341. With respect to § 195, then, the only question is whether "hot-deck imputation" is a form of sampling.

To answer this question, I begin with the definition of sampling the Bureau provided to Congress in connection with the year 2000 census:

> "In our common experience, 'sampling' occurs whenever the information on a portion of a population is used to infer information on the population as a whole[,] . . . [although] [a]mong professional statisticians, the term 'sample' is reserved for instances when the selection of the smaller population is based on the methodology of their science." Report to Congress—The Plan for Census 2000, p. 23 (revised and reissued Aug. 1997).

Under this definition, the Bureau's use of imputation was a form of sampling. The Bureau used a predefined, deterministic method to select a portion of the population and then used that portion of the population to estimate unknown information about the overall population. The Bureau's imputation process first selected a group of "donor" addresses, one for each address that had not been successfully enumerated. This donor group was a subset of the overall population. Indeed, the donor group was actually a subset *of a subset* of the population because it was selected from only those addresses that had not returned an initial question-

naire but were successfully enumerated through other means. This highlights the Bureau's reliance on a selected portion of collected data.

Next, the Bureau used the population of the donor group as a direct estimate of the number of people who had not been successfully enumerated. This estimate related to the "population as a whole" because it was an estimate of the overall number of people in the population who had not responded (or had not provided a consistent response, see *ante*, at 457) to the Bureau's survey efforts. See, *e. g.*, F. Yates, Sampling Methods for Censuses and Surveys 64, 130 (2d rev. ed. 1953) (describing the use of sampling to estimate survey nonresponse); *ante*, at 471 (describing the sampling at issue in *House of Representatives* as one for estimating nonresponse). Because the imputation process selected a portion of the population to estimate the number of people who had not been successfully enumerated, the process constituted a form of sampling.

To counter this conclusion, the majority contends that the Bureau's use of imputation differs from sampling in several different ways. First, the majority argues that the Bureau's use of imputation differs quantitatively from other forms of sampling, suggesting that estimating nonresponse is not sampling when the amount of nonresponse is very small. See *ante*, at 471 (contrasting the use of sampling to estimate a 10% level of nonresponse with the use of imputation to estimate a 0.4% level of nonresponse). But the majority provides no statistical basis to suggest that sampling is confined to "large" estimates. Moreover, we have already decided that the *extent* of the Bureau's reliance on sampling is irrelevant when we held that § 195 prohibits sampling for apportionment purposes regardless of whether it is used as a "'substitute'" for *or* "'supplement'" to a traditional enumeration. *House of Representatives, supra*, at 342.

Indeed, the majority more generally acknowledges that the Bureau's reliance on imputation may be distinguishable

only in degree from other forms of sampling. See *ante,* at 471 (stating that the sampling at issue in *House of Representatives* differs "in degree if not in kind" from the imputation at issue here). But the majority provides no statistical basis for claiming a difference of degree matters to the question of what constitutes sampling, nor does it explain how a meaningful line between sampling and nonsampling could be drawn on such a basis.

Second, the majority contends that imputation is not sampling because the sample selection method used by the Bureau does not look like "typica[l]," *ante,* at 467, selection methods in terms of *when* or *how* the relevant sample is selected. With respect to when a sample is selected, the majority contends that imputation is not sampling because it occurs after all data have been collected. See *ante,* at 466. This presumes that one cannot sample from already-collected data. But sampling from collected data is a recognized form of sampling, even when the collected data result from an attempt to survey the entire population. See Yates, *supra,* at 128.

With respect to *how* a sample is selected, the majority argues that imputation does not look like methods employed "to find a subset that will resemble a whole through the use of artificial, random selection processes." *Ante,* at 467. But the Bureau's "nearest neighbor" imputation process is just as artificial as any other form of nonrandom selection, and it is beyond dispute that nonrandom selection methods— including those that produce nonrepresentative samples— may be used for sampling. See, *e. g.,* W. Hendricks, Mathematical Theory of Sampling 239–241 (1956); P. Sukhatme, Sampling Theory of Surveys with Applications 10 (1954); F. Stephan, History of the Uses of Modern Sampling Procedures, 43 J. Am. Statistical Assn. 12, 21 (1948) (all indicating that nonrandom selection methods may be used for sampling); see also Yates, *supra,* at 17; R. Jessen, Statistical Survey Techniques 16 (1978); W. Deming, Sample Design in

Business Research 32 (1960) (together indicating that the selection of nonrepresentative or "biased" samples may be permissible, preferred, or even deliberate). Finally, even if random and unbiased selection methods were assumed to be more accurate than other methods of sampling, it would make little sense to construe § 195 as prohibiting only the most accurate forms of sampling.

Third, the majority contends that imputation is not sampling because the Bureau never meant to engage in sampling. Along these lines, the majority stresses that the Bureau's "overall approach to the counting problem," *ante*, at 466, did not reflect a "deliberate decision," *ante*, at 471, to engage in sampling. Instead, according to the majority, the Bureau's "immediate objective was the filling in of missing data," in an effort to ascertain population information on "individual" units, not "extrapolating the characteristics of the 'donor' units to an entire population." *Ante*, at 467.

The majority provides no statistical basis for defining sampling in terms of intent or immediate objectives, however, and to do so would allow the Bureau to engage in any form of sampling so long as it was characterized as something else or appeared to serve some nonsampling objective. But that would render hollow the statutory prohibition on sampling for apportionment purposes. The majority allows this to happen, however, by focusing on the Bureau's "immediate objective" of filling in missing data, which overlooks the fact that the Bureau estimated nonresponse using a selected subset of the population and imputation was simply a means to that end.

Fourth, the majority contends that some definitions of sampling, if viewed broadly, contain no limiting principle and thus might encompass even "the mental process of inference." *Ante*, at 470. But recognizing the Bureau's use of imputation as a form of sampling does not require that sampling be read so broadly. Instead, sampling under § 195 can be confined to situations where a selected subset of the popu-

lation has been directly surveyed on a particular attribute and then that subset is used to estimate population characteristics of that *same* attribute. Such a limitation is neither ill defined nor all encompassing.

Apart from the above arguments, which primarily relate to the statistical characterization of imputation, the majority makes several additional arguments. It contends that Congress' use of the term "sampling" should be read narrowly, limited to what "the Secretary called 'sampling,' at the time." *Ante*, at 469. But the statutory prohibition was not written in terms of what the Secretary viewed as sampling, nor is there any reason to think Congress intended the term "sampling" to be read narrowly as a tight restriction on the Bureau's ability to gather data for nonapportionment purposes. Rather, the "purpose . . . [was] to permit the utilization of *something less than a complete enumeration,* as implied by the word 'census,' . . . except with respect to apportionment." H. R. Rep. No. 1043, 85th Cong., 1st Sess., 10 (1957) (emphasis added). This suggests "sampling" was meant in a broad rather than narrow sense.

Moreover, because the Bureau's authorization to use sampling for nonapportionment purposes was simultaneously a prohibition on the use of sampling for apportionment purposes, it makes even less sense to construe "sampling" narrowly *when viewed as a prohibition* given the broader historical context in which § 195 marked "the first departure from the requirement that the enumerators collect all census information through personal visits to every household in the Nation." *House of Representatives*, 525 U. S., at 336. Finally, even if one were willing to assume that the statutory prohibition should not be read to cover statistical techniques the Bureau had used for apportionment purposes prior to 1957, that still would not justify the use of imputation since the Bureau had never before added people to the apportionment count using that process. See Hogan ¶¶ 39, 41, App. 266–268.

The majority also notes the possibility of *Chevron* deference with respect to the scope of the term "sampling." *Ante*, at 472 (citing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984)). But the majority ultimately does not rely on this form of deference, *ante*, at 472, nor does it indicate where the Bureau has provided an interpretation of § 195 that would have the "force of law" on this issue. See *Christensen* v. *Harris County*, 529 U. S. 576, 587 (2000) (explaining that agency "[i]nterpretations . . . which lack the force of law . . . do not warrant *Chevron*-style deference"). Additionally, based on the reasons provided by JUSTICE THOMAS' partial dissent, I would find that the Bureau's use of imputation to calculate state population totals for apportionment purposes at least raises a difficult constitutional question. This provides a basis to construe § 195 as precluding imputation, regardless of whether the Bureau is entitled to any form of deference. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 574–575 (1988).

The majority downplays the idea that imputation could be used to manipulate census results, arguing that "manipulation would seem difficult to arrange" in light of the "uncertainties as to which States imputation might favor." *Ante*, at 472. But in every census where imputation would alter the resulting apportionment, the mere decision to impute or not to impute is a source of possible manipulation. While that might be averted if the Bureau were required to use imputation, I do not read the majority's opinion to demand that. Moreover, in the past, we have given deference to the Secretary's decision *not* to statistically adjust the census, even when a final decision on that matter was not made until after the census was completed. See *Wisconsin* v. *City of New York*, 517 U. S. 1, 10–11, 20–24 (1996).

Finally, the majority suggests that imputation is somehow "better" than making no statistical adjustment at all. *Ante*, at 470. But no party has cited a study suggesting that

imputation improves distributive accuracy, and the Bureau admits that numeric rather than distributive accuracy "drove the process." Hogan ¶ 34, App. 264; see also *id.*, at ¶¶ 34–35, App. 265 (acknowledging that it may be "impossible to know *a priori* the effects of a particular census operation on distributive accuracy" and that "[i]n designing Census 2000, the Census Bureau did not reject operations that would improve numeric accuracy . . . even if these operations might affect distributive accuracy *negatively*" (emphasis added)). I therefore would not assume that imputation necessarily resulted in a "better" census given the recognized importance of distributive accuracy in assessing overall accuracy. See *Wisconsin, supra,* at 20 (stating that "a preference for distributive accuracy (even at the expense of some numerical accuracy) would seem to follow from the constitutional purpose of the census, viz., to determine the apportionment of the Representatives among the States").

### III

Because the Bureau used "hot-deck imputation" to make the same statistical inferences it could not make through more transparent reliance on sampling, I would find that the Bureau's use of imputation was a form of sampling and thus was prohibited by § 195. I therefore respectfully dissent from Part III of the majority's opinion and have no occasion to decide whether the Constitution prohibits imputation, which the majority addresses in Part IV. For these reasons, I would reverse the judgment of the District Court.

JUSTICE THOMAS, with whom JUSTICE KENNEDY joins, concurring in part and dissenting in part.

Conducting a census to count over 200 million people is an enormously complicated and difficult undertaking. To facilitate the task, statisticians have created various methods to supplement the door-to-door inquiries associated with the "actual Enumeration" and "counting [of] the whole number

of persons in each State" required by the Constitution. Art. I, § 2, cl. 3; Amdt. 14, § 2. Today we consider whether 13 U. S. C. § 195 prohibits the use of one of these methods—hot-deck imputation—for apportionment purposes, and if not, whether its use is permissible under the Constitution. In accordance with our decision in *Franklin* v. *Massachusetts*, 505 U. S. 788 (1992), I believe that we have jurisdiction to consider these questions concerning the year 2000 census. For essentially the same reasons given by the Court, I agree that imputation is not prohibited by 13 U. S. C. § 195.

I cannot agree, however, with the Court's resolution of the constitutional question. The Constitution apportions power among the States based on their respective populations; consequently, changes in population shift the balance of power among them. Mindful of the importance of calculating the population, the Framers chose their language with precision, requiring an "actual Enumeration," U. S. Const., Art. I, § 2, cl. 3. They opted for this language even though they were well aware that estimation methods and inferences could be used to calculate population. If the language of the Census Clause leaves any room for doubt, the historical context, debates accompanying ratification, and subsequent early Census Acts confirm that the use of estimation techniques—such as "hot-deck imputation," sampling, and the like—do not comply with the Constitution.

I

The use of the statistical technique known as hot-deck imputation increased the final year 2000 census count by 1,172,144 people, representing 0.42 percent of the Nation's total population. U. S. Dept. of Commerce, Economics and Statistics Admin., Census 2000 Informational Memorandum No. 110, App. 443. Utilization of this method in the year 2000 census had important consequences for two States in particular, North Carolina and Utah: North Carolina gained

one Representative and Utah lost one Representative as a result of hot-deck imputation. See *ante*, at 458.

While the Court has aptly described the process of "hot-deck imputation," several facts about this method are worth noting at the outset. The Census Bureau refers to hot-deck imputation procedures as "estimation." U. S. Dept. of Commerce, Decennial Statistical Studies Division, Census 2000 Procedures and Operations, Memorandum Series Q–34 (hereinafter Memorandum Series), App. 153, 156. It used this form of "estimation" for three different categories of units: (1) those units classified as occupied but with no population count (household size imputation), (2) those units that are unclassified (either occupied or vacant) but that "we know exist" (occupancy imputation), and (3) those units that are unclassified and are "either occupied, vacant, or delete" (status imputation). Memorandum Series B–17, *id.*, at 194–195. The "status imputation" category is the most troubling, because, as explained by the Department of Commerce, it refers to households "for which we know nothing," *id.*, at 195, and therefore which may not even exist.

The Census Bureau explains that "[f]or estimation purposes, six categories are defined" because each of the preceding types of units are divided into two groups: single unit addresses and multiunit addresses. *Ibid.* The Bureau calls the six categories "estimation categories," and permits only certain types of units for each category to be used as "donors." *Ibid.* The Bureau then uses these donor units, for which data has already been obtained, to impute characteristics to a neighboring unit that falls within the above categories.

Whether this "estimation" technique passes constitutional muster depends on an evaluation of the language of the Census Clause and its original understanding.[1]

---

[1] We gave some consideration to a similar question in *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316 (1999),

## II

The Framers constitutionalized the requirement that a census be conducted every decade. U. S. Const., Art. I, §2, cl. 3. In so doing, they chose their words with precision. Chief Justice Marshall instructed that "[a]s men whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." *Gibbons* v. *Ogden*, 9 Wheat. 1, 188 (1824). We should be guided, therefore, by the Census Clause's "original meaning, for '[t]he Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now.'" *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 359 (1995) (THOMAS, J., concurring in judgment) (quoting *South Carolina* v. *United States*, 199 U. S. 437, 448 (1905)).

Article I, §2, cl. 3, as modified by §2 of the Fourteenth Amendment, provides: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." The Census Clause specifies that this "actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten

when considering a challenge to the Department of Commerce's decision to use statistical sampling in the decennial census for apportionment purposes. There was no need, however, to decide the constitutional question in that case because we held that 13 U. S. C. § 195 "prohibits the use of sampling in calculating the population for purposes of apportionment." 525 U. S., at 340. Both JUSTICE STEVENS and JUSTICE SCALIA, however, weighed in on the matter. See *id.*, at 362–364 (STEVENS, J., dissenting); *id.*, at 346–349 (SCALIA, J., concurring in part).

Years, in such Manner as they shall by Law direct." Art. I, § 2, cl. 3.[2]

The Constitution describes the process both as "counting the whole numbers of persons" and as an "actual Enumeration." Dictionary definitions contemporaneous with the ratification of the Constitution inform our understanding. "Actual" was defined at the time of the founding as "really done: In *Metaphysics*, that is actual, or in act, which has a real being or existence, and is opposite to *Potential.*" N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789); see also T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) (defining "actual" as "[r]eally in act, not merely potential; in act, not purely in speculation"). Sheridan defined "[e]numeration" as "[t]he act of numbering or counting over" and "[t]o enumerate" as "to reckon up singly; to count over distinctly." See also 1 S. Johnson, A Dictionary of the English Language 658 (4th rev. ed. 1773) (defining "enumerate" as "[t]o reckon up singly; to count over distinctly; to number"; and "enumeration" as "[t]he act of numbering or counting over; number told out"). "Count" was defined as "to number; to tell." *Id.*, at 435.[3] See also 1 N. Webster, An American Dictionary of the English Language (1828) ("To number; to tell or name one by one, or by small numbers, for ascertaining the whole number of units in a collection").

As JUSTICE SCALIA explained in *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 346–347 (1999) (opinion concurring in part), dictionary def-

---

[2] The "actual Enumeration" was originally to be used both for apportionment of Members of the House of Representatives and for direct taxation. Adoption of the Sixteenth Amendment, however, removed the requirement of apportionment for direct taxes. U. S. Const., Amdt. 16 ("The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration").

[3] The word "count" did not appear in the original version of Art. I, § 2, cl. 3. It did, however, appear in the definitions of "enumeration."

initions contemporaneous with the founding "demonstrate that an 'enumeration' requires an actual counting, and not just an estimation of number." "The notion of counting 'singly,' 'separately,' 'number by number,' 'distinctly,' which runs through these definitions is incompatible (or at least *arguably* incompatible, which is all that needs to be established) with gross statistical estimates." *Id.*, at 347.[4] Nor can it be said that these definitions encompass estimates by imputation.[5]

In addition, at the time of the founding, "conjecture" and "estimation" were often contrasted with the actual enumeration that was to take place pursuant to the Census Clause. During debate over the first Census Act, James Madison made such a distinction, noting that the census would provide an "exact number of every division" as compared to "assertions and conjectures." 2 The Founders' Constitution 139 (P. Kurland & R. Lerner eds. 1987) (hereinafter Founders' Constitution). Similarly, when describing a document containing the results of the first census, Thomas Jefferson noted the difference between the returns that were "actual" and those that were added in red ink by "conjectur[e]." 8 The Writings of Thomas Jefferson 229 (A. Lipscomb ed. 1903). George Mason, at one point, observed that he "doubted much whether the conjectural rule which was

---

[4] The parenthetical reflects the fact that JUSTICE SCALIA was construing a statutory provision so as to avoid serious constitutional doubt. See *House of Representatives, supra,* at 346 (opinion concurring in part).

[5] Moreover, while the Court states that the Constitution "uses a general word, 'enumeration,' that refers to a counting process without describing the count's methodological details," *ante,* at 474, the meaning of "enumeration" has not materially changed since the time of the founding. To "enumerate" is now defined as "to ascertain the number of: COUNT," and also "to specify one after another: LIST." See Webster's Ninth New Collegiate Dictionary 416 (1988). "Enumeration" meant at the time of the founding, as it does now, to count individually and specifically and simply does not admit of various counting methodologies.

to precede the census, would be as just, as it would be rendered by an actual census." Founders' Constitution 108.[6]

Historians and commentators after the founding also distinguished actual enumerations from conjectures, demonstrating that there was a common understanding of these terms. For instance, an 1835 book about statistics in the United States explains that "[t]he number of inhabitants in this country, prior to its separation from Great Britain, rests principally on conjectural estimates." T. Pitkin, A Statistical View of the Commerce of the United States of America 582 (hereinafter Pitkin); see also Brief for Appellants 40–41. Prior to the revolution, when the British Board of Trade called upon the Governors to provide an account of their populations, some Colonies made "actual enumerations," such as Connecticut in 1756 and in 1774, while others made estimates "founded upon the number of taxable polls, or the number of the militia." Pitkin 582–583. A widely cited 1800 article published in England by John Rickman after the first United States census also used the term "actual enumeration" several times to describe the count that "must always be under the real number," noting at the same time that this "method (fraught with trouble and expence) attempts an accuracy not necessary, or indeed attainable, in a fluctuating subject." John Rickman's Article on the Desirability of Taking A Census, reprinted in D. Glass, Numbering the People 111 (1973) (hereinafter Glass). See also Brief for Appellants 47. Discussion of an "actual enumeration" can be contrasted to his subsequent proposal for England, which included estimation methods resembling both sampling and imputation since Rickman deemed it appropriate to make "general inferences"

---

[6] By "conjectural rule," we can presume that he meant to refer to the population estimates used by the Constitutional Convention to determine the number of Representatives of Congress from each State prior to the first census. See H. Alterman, Counting People: The Census in History 188 (1969) (hereinafter Alterman).

from modern registers to make up for deficient registers. Glass 111–112.

To be sure, the Census Clause enables Congress to prescribe the "Manner" in which the enumeration is taken. The Court suggests that "enumeration" implies the breadth of Congress' methodological authority, rather than its constraints. See *ante,* at 474. But while Congress may dictate the manner in which the census is conducted,[7] it does not have unbridled discretion. For the purposes of apportionment, it must follow the Constitution's command of an "actual Enumeration." Madison made this point clear during debate of the first Census Act when he noted the difficulties "attendant on the taking the census, in the way required by the constitution, and which we are obliged to perform." Founders' Constitution 139.

The Court also places undue weight on the penultimate version of the Clause, the iteration that was given to the Committee of Detail and Committee of Style. See *ante,* at 474–475. Whatever may be said of the earlier version, the Court rejected a similar reliance in *Nixon* v. *United States,* 506 U. S. 224, 231 (1993), because "we must presume that the Committee's reorganization or rephrasing accurately captured what the Framers meant in their unadorned lan-

---

[7] As described *infra,* at 503–504, Congress has implemented this power in a variety of ways, such as by authorizing marshals to "cause the number of the inhabitants to be taken" and to appoint as many assistants as necessary, establishing the timeframe within which the census is to be completed, and setting methods of payment for assistants. Act of Mar. 1, 1790, § 1, reprinted in C. Wright, History and Growth of the United States Census (prepared for the Senate Committee on the Census), S. Doc. No. 194, 56th Cong., 1st Sess., 925 (1900) (hereinafter Wright). In recent years, the Bureau through its delegated power has adopted a number of measures to reduce error, including "an extensive advertising campaign, a more easily completed census questionnaire, and increased use of automation, which among other things facilitated the development of accurate maps and geographic files for the 1990 census." *Wisconsin* v. *City of New York,* 517 U. S. 1, 8 (1996).

guage." Carrying the majority's "argument to its logical conclusion would constrain us to say that the *second to last draft* would govern in every instance where the Committee of Style added an arguably substantive word. Such a result is at odds with the fact that the Convention passed the Committee's version, and with the well-established rule that the plain language of the enacted text is the best indicator of intent." *Id.,* at 231–232. Rather than rely on the draft, I focus on the words of the adopted Constitution.

### III

The original understanding can be discerned not only by examining the text but also by considering the "meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions of the people of and in the several states." *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 721 (1838). The history of census taking in the Colonies and elsewhere, discussions surrounding the ratification of the Census Clause, and the early statutes implementing the Clause provide insight into its meaning.

### A

Census taking is an age-old practice. With only a few exceptions, however, before the 19th century most countries conducted partial enumerations that were supplemented by estimates of the unenumerated portion of the population. Wolfe, Population Censuses Before 1790, 27 J. Am. Statistical Assn. 357 (1932) (hereinafter Wolfe). The contentious history of censuses, partial or otherwise, has long influenced decisions about whether to undertake them. See *id.,* at 358 ("The Biblical account of the Lord's wrath at the taking of [the 'census' taken by David] remained an argument against census taking even as late as the eighteenth century").[8] It

---

[8] This traditional religious objection to census taking was based on the "sin of David, who brought a plague upon Israel by 'numbering' the people (2 Sam. 24:1–25, 1 Chron. 21:1–30)." P. Cohen, A Calculating People 256,

is a history rampant with manipulation for political and fiscal gains. See generally *id.*, at 359–370; Alterman 43, 54; Glass 19–20.

At times, political resistance to censuses precluded their taking. Suspicion of government and opposition on religious grounds, for example, prevented a general census in France during the 18th century. Wolfe 367; see also Alterman 49. And in England, while "estimates and conjectures" as to changes in the population were frequently made in the 18th century, a 1753 proposal to provide for a general enumeration was rejected by Parliament, because it was thought that a census might reveal England's "weakness to her enemies," and that it might be followed by "some public misfortune or epidemical distemper." Wolfe 368 (internal quotation marks omitted).[9]

England was in part responsible for the first colonial censuses, as the British Board of Trade required population counts so that it could properly administer the Colonies. D. Halacy, Census: 190 Years of Counting America 29 (1980) (hereinafter Halacy). The Colonies had their own encounters with various population counting methods. Prior to 1790, there were at least 38 population counts taken in the Colonies. See Alterman 165. According to one historian, however, there was "reason to suspect, [that the censuses were] often intentionally misleading, when officials, on the one hand of the boastful, or on the other hand of the timid type, thought to serve some interest by exaggeration or by understatement." F. Dexter, Estimates of Population in the

n. 24 (1982) (hereinafter Cohen). Some colonial governors apparently blamed their inability to administer censuses on this fear, although it is unclear to what extent this actually reflected public sentiment. *Ibid.*

[9] The 1753 bill contemplated by the British Parliament received a great deal of publicity and attention. Glass 17. The proposal provided that overseers would "go from house to house in their parishes, recording the numbers of persons actually dwelling in each house during the twelve preceeding hours." *Id.*, at 18.

American Colonies, in Proceedings of the American Antiquarian Society 22 (1887) (hereinafter Dexter).

Many Americans resisted census-taking efforts. According to an 1887 inventory of the Colonies' attempts at population estimates, "Connecticut pursued in her colonial history the policy of hiding her strength in quietness; so far as might not be inconsistent with general truthfulness, she preferred to make no exhibit of her actual condition." *Id.*, at 31.[10] A 1712 census in New York "met with so much opposition, from superstitious fear of its breeding sickness, that only partial returns were obtained." *Id.*, at 34 (citations omitted). See also Century 3. In New Jersey, the population counts of the mid-18th century apparently comprised "such guesses as the Royal Governors could make, for the satisfaction of their superiors." Dexter 36. In 1766, Benjamin Franklin "supposed that there might be about 160,000 whites in Pennsylvania . . . but he did not profess to speak with accuracy, and was under a bias which led him, perhaps unconsciously, into cautious understatement." *Id.*, at 38. Georgia was apparently "singularly misrepresented, being overestimated in the Federal Convention of 1787 at nearly half as much again as her real amount of population, while the rest of the colonies were underestimated considerably,— the total of the Convention's figures falling short of the reality by more than half a million." *Id.*, at 49.

The Framers also had experience with various statistical techniques. For example, Thomas Jefferson, who as Secretary of State would later be charged with running the first official national census, had a great interest in mathematics

---

[10] See also Dept. of Commerce and Labor, A Century of Population Growth: From the First Census of the United States to the Twelfth, 1790–1900, p. 4 (1909) (hereinafter Century) ("The people of Massachusetts and Connecticut manifested considerable opposition to census taking, seeing no advantage in it to themselves, and fearing that in some way the information obtained would be used by the British authorities to their disadvantage").

and numbers.   See Halacy 33; Cohen 112–113.   In 1782, Jefferson estimated Virginia's population and his calculation exhibited an awareness that statistical estimation techniques could be used to calculate population.   Virginia had been unable to manage a full census for the Continental Congress; eight counties had failed to turn in any census data.   J. Cassedy, Demography in Early America: Beginnings of the Statistical Mind, 1600–1800, p. 228 (1969) (hereinafter Cassedy).   Jefferson had to extrapolate from incomplete tax returns, militia muster rolls, and other data.   Nonetheless, he produced an estimate of 567,614.   *Ibid.*   First, he listed certain known facts, including data about Virginia's population in all but eight counties.   In the eight counties for which information was not available, he knew that there had been 3,161 men in the militia in 1779 and 1780.   He then listed five assumptions, such as "[t]he number of people under 16 years of age was equal to the number 16 years and over," on which he based his final estimate.   Alterman 168–169.

Another elaborate effort at population calculation was undertaken by the Governor of Massachusetts in 1763, who estimated his Colony's population in three ways.   First, he made an estimate from a return to the General Court of "'rateable polls'" of males over 16 eligible to vote.   He added an estimate of males who were too poor to pay the poll tax, and then added similar numbers of females.   He made another estimate by multiplying the militia returns by four.   He calculated a third estimate from the number of houses.   Since many believed that houses averaged five occupants and others "preferred five and a half," he used both numbers.   After giving the British Board of Trade several numbers, however, he concluded that the "actual population was none of these figures" and the population was in fact higher.   Cassedy 73.   In any event, "[s]ince all of the returns used in the estimates had been made for tax purposes, it was understood that they would be well on the low side." *Ibid.*

The Framers were quite familiar not only with various census-taking methods but also with impediments to their successful completion. The Continental Congress had already used population estimates to make decisions about taxation, and such efforts were met with resistance. In 1775, the Continental Congress had ascertained population estimates for the Colonies in order to apportion the taxes and costs of the Revolutionary War. Pitkin 583. See also Halacy 30–31 ("Debts incurred in the Revolutionary War hastened the ordering of a standard form of census. A census of the colonies had been ordered, but some of them never complied, and the rest did so in different ways"). New Hampshire in particular complained that the estimate of its population for the purposes of calculating Revolutionary War costs was too high. Pitkin 583. It had "caused an actual enumeration to be . . . made, by which it appeared, that the number of her inhabitants" was 20,000 lower than the estimate. *Ibid.* See also Brief for Appellants 47. New Hampshire petitioned the Continental Congress to change the amount of taxation. New Hampshire's effort was in vain, because Congress "refused to alter her proportion of her taxes on that account." *Ibid.* See also 10 New Hampshire Provincial and State Papers 580 (reprint 1973) ("[T]he [proportion of taxes assigned New Hampshire by Congress in 1781] is too high by a very considerable sum, that by our numbers which were taken in the year 1775 by the selectmen of the several Towns & Parishes & Return made under Oath . . . this proportion will appear much too large").

## B

The Framers knew that the calculation of populations could be and often were skewed for political or financial purposes. Debate about apportionment and the census consequently focused for the most part on creating a standard that would limit political chicanery. While the Framers did not extensively discuss the method of census-taking, many

expressed the desire to bind or "shackle" the legislature so that neither future Congresses nor the States would be able to let their biases influence the manner of apportionment. See Founders' Constitution 103–104. As James Madison explained:

> "In one respect, the establishment of a common measure for representation and taxation will have a very salutary effect. As the accuracy of the census to be obtained by the Congress will necessarily depend, in a considerable degree, on the disposition, if not on the cooperation of the States, it is of great importance that the States should feel as little bias as possible to swell or to reduce the amount of their numbers. Were their share of representation alone to be governed by this rule, they would have an interest in exaggerating their inhabitants. Were the rule to decide their share of taxation alone, a contrary temptation would prevail. By extending the rule to both objects, the States will have opposite interests which will control and balance each other and produce the requisite impartiality." The Federalist No. 54, pp. 340–341 (C. Rossiter ed. 1961).

Alexander Hamilton likewise noted, in a discussion about the proportion of taxes that "[a]n actual census or enumeration of the people must furnish the rule, a circumstance which effectually shuts the door to partiality or oppression." *Id.*, No. 36, at 220.

Discussion revealed a keen awareness that absent some fixed standard, the numbers were bound to be subject to political manipulation. While Gouverneor Morris appears to have been one of the strongest opponents of "fettering the Legislature too much," he at least recognized that if the mode for taking the census was "unfixt the Legislature may use such a mode as will defeat the object: and perpetuate the inequality." Founders' Constitution 102. He believed, however, that "[i]f we can't agree on a rule that will be just

at this time, how can we expect to find one that will be just in all times to come." *Id.*, at 104. Edmund Randolph, on the other hand, noted that if dangers suggested by Gouverneor Morris were "real, of advantage being taken of the Legislature in pressing moments, it was an additional reason, for tying their hands in such a manner that they could not sacrifice their trust to momentary considerations." *Id.*, at 103.

During debate of a proposal "to take a periodical census," George Mason noted that he "did not object to the conjectural ratio which was to prevail in the outset" for apportionment, prior to the census, but "considered a Revision from time to time according to some permanent & precise standard as essential to . . . fair representation." *Id.*, at 102–103. "From the nature of man," Mason observed, "we may be sure, that those who have power in their hands will not give it up while they can retain it. On the Contrary we know they will always when they can rather increase it." *Id.*, at 103.

Some who initially believed that the Congress should have discretion changed their minds after listening to the arguments by Randolph, Mason, and others. Roger Sherman, for example, "was at first for leaving the matter wholly to the discretion of the Legislature; but he had been convinced by the observations of (Mr. Randolph & Mr. Mason) that the *periods* & the *rule* of revising the Representation ought to be fixt by the Constitution." *Id.*, at 104. Nathaniel Ghorum perceptively noted that "[i]f the Convention who are comparatively so little biassed by local views are so much perplexed, How can it be expected that the Legislature hereafter under the full biass of those views, will be able to settle a standard." *Ibid.* On the other hand, Reid continued to believe that "the Legislature ought not to be too much shackled." *Ibid.* He also thought that "[it] would make the Constitution like Religious Creeds, embarrassing to those bound to conform to them & more likely to produce dissatisfaction and Scism, than harmony and union." *Ibid.*

While debate continued, with various iterations of the Clause considered, it was clear that the principle concern was that the Constitution establish a standard resistant to manipulation. As Justice Story later observed, "apportion[ing] representatives among the states according to their relative numbers . . . had the recommendation of great simplicity and uniformity in its operation, of being generally acceptable to the people, and of being less liable to fraud and evasion, than any other, which could be devised." Commentaries on the Constitution of the United States § 327, p. 238 (R. Rotunda & J. Nowak eds. 1987).

## C

We have long relied on contemporaneous constructions of the Constitution when interpreting its provisions, for "early congressional enactments 'provid[e] "contemporaneous and weighty evidence" of the Constitution's meaning.'" *Printz* v. *United States,* 521 U. S. 898, 905 (1997) (citations omitted). See also *Myers* v. *United States,* 272 U. S. 52, 175 (1926) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions" (collecting cases)). Accordingly, I turn next to the early Census Acts, which provide significant additional evidence that the Framers meant what they said in adopting the words "actual Enumeration."

From the first census, Congress directed that the census be taken by actually counting the people. *House of Representatives,* 525 U. S., at 335. Congress enacted a series of requirements for how to accomplish the counting; none mention the use of sampling or any other statistical technique or method of estimation. Rather, the first Census Act described, among other things, how many census takers (or deputies) could be used, their pay, the consequences of falsifying papers, what address to attribute to persons who had

more than one address, and how to count those who did not have an address. Congress ordered the first census to begin on August 2, 1790, and to be completed within nine months. Century 45. Marshals and their assistants were required to "take an oath or affirmation" to "'truly cause to be made, a just and perfect enumeration and description of all persons resident within [their] district[s].'" Act of Mar. 1, 1790, § 1, reprinted in Wright 925.

The Act required marshals to aggregate the numbers, but there was no provision allowing the marshals to estimate or extrapolate in order to fill in missing data. The Act provided that the "assistants" could, for a particular family, use data given by one member of that family. But the information could be taken only from persons over age 16, and these persons were required to give the assistant "a true account." § 6, id., at 926. No other method of counting appears to have been permissible. And failure to make a return or falsifying a return triggered heavy monetary penalties and the threat of prosecution. §§ 2, 3, ibid. In 1810, Congress added an express statement that "'the said enumeration shall be made by an actual inquiry at every dwelling-house, or of the head of every family within each district, and not otherwise.'" House of Representatives, supra, at 335 (citing Act of Mar. 26, 1810, § 1, 2 Stat. 565–566). The provision requiring census takers to visit personally each home appeared in statutes governing the next 14 censuses. See 525 U. S., at 335–336, and n. 5 (surveying Census Acts).

There was widespread awareness that the early censuses were not entirely accurate. The enumerators confronted many problems, including confusion regarding which houses belonged to which districts, danger on the roads, the unwillingness of citizens to give the required information, superstition, and a fear from some that the census was connected to taxation. Century 45–46. For example, in a 1791 letter from George Washington to Gouverneor Morris dated before the first census was complete, Washington noted the differ-

ence between the "enumeration" and an estimate he had previously given, and acknowledged that the official census would not be accurate:

"In one of my letters to you the account which I gave of the number of inhabitants which would probably be found in the United States on enumeration, was too large. The estimate was then founded on the ideas held out by the Gentlemen in Congress of the population of their several States, each of whom (as was very natural) looking thro' a magnifying glass would speak of the greatest extent, to which there was any probability of their numbers reaching. Returns of the Census have already been made from several of the States and a tolerably just estimate has been formed now in others, by which it appears that we shall hardly reach four millions; but one thing is certain our *real* numbers will exceed, greatly, the official returns of them." 31 Writings of George Washington 329 (J. Fitzpatrick ed. 1931).

Apparently concerned about the effect that the results of the first census would have on foreign opinion, Jefferson, in a 1791 letter sending the results abroad, explained: "I enclose you a copy of our census, which, so far as it is written in black ink, is founded on actual returns, what is in red ink being conjectured, but very near the truth. Making very small allowance for omissions, which we know to have been very great, we may safely say we are above four millions." 8 Writings of Thomas Jefferson, at 229. While perhaps disappointed with the results of the census, he noted the difference between the returns that were "actual" and those that were added in red ink by "conjectur[e]." *Ibid.*[11] There is

---

[11] It was later believed that the disappointment was "largely due to the exaggerated estimates of colonial population." Wright 17. See also Alterman 205 ("Many census historians believe, as Washington hinted . . . that the disappointment was due to the exaggerated hopes born of a newly won independence, as well as to the unrealistic estimates of the colonial population").

no suggestion, however, that his additional "conjectures" were used for apportionment. See T. Woolsey, The First Century of the Republic 221 (1876); Alterman 205. "Despite its deficiencies, the census provided the factual base about the American people which officials and scholars needed." Cassedy 220. Thus, while the Court asserts that there was a "strong constitutional interest in accuracy," *ante*, at 478, the stronger suggestion is that the Framers placed a higher value on preventing political manipulation.

## IV

The text, history, and a review of the original understanding of the Census Clause confirm that an actual enumeration means an actual count, without estimation. While more sophisticated statistical techniques may be available today than at the time of the founding, the Framers had a great deal of familiarity with alternative methods of calculating population. They decided to constitutionalize the arduous task of an actual enumeration. I am persuaded that much like the earlier methods of estimation, hot-deck imputation—a modern statistical technique that the Census Bureau refers to as "estimation"—is not constitutionally permissible.

In recent decades, decisions regarding whether, and what kind of, imputation and other statistical methods should be utilized have changed from administration to administration. Departing from past practice, imputation was first used in the year 1960 census. The Bureau has used some form of it in every decennial census since then. Plaintiffs' Statement of Undisputed Facts, App. 44; Response to Plaintiffs' Statement of Material Facts, *id.*, at 222. In the year 1970 census, about 900,000 persons were imputed to the apportionment count through household size and occupancy imputation. The Census Bureau also used a form of estimation that combined imputation and sampling. Declaration of Howard Hogan, *id.*, at 268–269 (hereinafter Hogan). In 1980, the use of imputation shifted one seat in the House of Representa-

tives from Indiana to Florida, *id.*, at 46, 224, making the year 2000 census at least the second time that its use has changed apportionment.[12]

At the earliest, status imputation was used in the year 1990 census, although there is some dispute as to whether it was even used then. *Id.*, at 45–46, n. 4; but see *id.*, at 223 (stating that "the 1990 imputation procedures continued the prior practice of using household size imputation and occupancy imputation but added status imputation"). Regardless, it apparently had no impact on apportionment. See *id.*, at 45–46, n. 4. In the year 1990 census, the Secretary specifically decided against using a different form of estimation. The "Secretary's administrative decision declining to make an adjustment observed that '[t]he imputation scheme used . . . [was] based on a series of assumptions that are mostly guesswork.'" Brief for Federal Petitioners in *Wisconsin* v. *City of New York*, O. T. 1995, Nos. 94–1614 etc., p. 8. The Secretary even noted that "large-scale statistical adjustment of the census through [this method] would 'abandon a two hundred year tradition of how we actually count people,'" and that "statistical adjustment of the 1990 census might open the door to political tampering in the future." *Wisconsin* v. *City of New York*, 517 U. S. 1, 10–12 (1996).

Though different in kind, our recent history of experimentation with census-taking methods bears similarity to the various preratification estimates and enumerations. While I would not speculate about the Bureau's decisionmaking process, it is quite evident that the Framers, aware that the use of any estimation left the door open to political abuse, adopted the words "actual Enumeration" to preclude the availability of methods that permit political manipulation.

Additionally, hot-deck imputation is properly understood as an estimation, which by definition cannot be an actual

---

[12] The Bureau states it "no longer has data available to determine whether count imputation affected apportionment in the 1960 or the 1970 Censuses." App. 224.

counting of persons. The Court contends that imputation does not differ in principle from other traditional methods of counting, such as questioning of "'neighbors, landlords, postal workers, or other proxies'" about the number of inhabitants in a particular place. *Ante*, at 477. But that point is flawed in several important respects. To begin with, from the first census, such information was taken through an actual inquiry of a family member who was over the age of 16. Act of Mar. 1, 1790, § 6, reprinted in Wright 926. That household member was "obliged to render to such assistant of the division, a true account, if required, to the best of his or her knowledge, of all and every person belonging to such family respectively . . . on pain of forfeiting twenty dollars, to be sued for and recovered by such assistant." *Ibid.* Estimation was not allowed and family members who were caught providing false information were subject to fines.

Questioning neighbors was not permitted until 1880 and even then census data could only be based on information provided by those "living nearest to such place of abode." Act of Mar. 3, 1879, § 8, *id.*, at 937. Again, family members or agents of families were required by law "to render a true account" and those who "willfully fail[ed] or refuse[d]" were "guilty of a misdemeanor" and required to "pay a sum not exceeding one hundred dollars." § 14, *id.*, at 938. That process is far different from a computation where data about one "donor" house, that appears on "Census Burea[u] records," Hogan, App. 255, compiled far away from the actual residence, is used to estimate data about another. With "status imputation," for example, the Census Bureau is willing to impute data even though it categorizes these households as "Donees" "for which we know nothing." Memorandum Series B–17, *id.*, at 195. While subsequent Acts may permit other forms of proxy, they do not assist with our analysis of the original understanding. Nor are we called upon to judge their constitutionality here. Because hot-deck imputation is an estimation procedure that includes persons not

"actually" counted, its use to adjust the census for apportionment purposes runs afoul of the Constitution.

The Court's further reflection that "the Bureau's only choice is to disregard the information it has, using a figure of zero, or to use imputation in an effort to achieve greater accuracy," *ante*, at 478, makes no difference as to whether it is constitutionally permissible. Even if hot-deck imputation produces more accurate results (and we do not have the means to answer that question), the Framers well understood that some Americans would go uncounted. Accuracy is not the dispositive factor in the constitutional consideration. Despite their awareness that estimation techniques could be used to supplement data, the Framers chose instead to require an "actual Enumeration" or "counting of whole persons." Disappointment following the first census did not prompt a change in this view or in the text. A zero must remain a zero under the dictates of the Constitution.

The Court takes the position that "enumeration" may be incompatible with gross statistical estimates, but concludes that such gross estimates are not at stake here. See *ante*, at 476. I derive little comfort from the fact that the Court has drawn a constitutional line at "'gross statistical estimates.'" *Ibid.* The Court neglects to explain the boundaries of such gross estimates, begging the question of how "gross" must "gross" be? The Court nonchalantly comments that the Census Bureau used the method "sparingly," see *ante*, at 477, and that the "inference involves a tiny percent of the population," *ante*, at 479. But the consequences are far from trivial. One State's representation in Congress is reduced while another's is fortified. If the use of hot-deck imputation in the next Census shifts the balance of power in "only" two or three seats, will the Court continue to defend the method? Today, we deal with hot-deck imputation. But if history is our guide, surely other statistical methods will be employed in future censuses and there will be similar challenges. By accepting one method of estimation as con-

stitutionally permissible, the Court has opened the door, and we will be continually called to judge whether one form of estimation is more acceptable than another.[13]

*   *   *

After much debate and faced with a long history of political manipulation, the Framers decided to make the taking of an "actual Enumeration" a constitutional requirement. While other nations had attempted population counts, none had made the count itself an important method of maintaining democracy by mandating it through a founding document. As a leading French statistician noted: "The United States presents in its history a phenomenon that has no parallel—that of a people who initiated the statistics of their country on the very day that they formed their government, and who regulated, in the same instrument, the census of their citizens, their civil and political rights, and the destiny of their people." Alterman 164. Well familiar with methods of estimation, the Framers chose to make an "actual Enumeration" part of our constitutional structure. Today, the Court undermines their decision, leaving the basis of our representative government vulnerable to political manipulation.

For the reasons stated above, I respectfully dissent from Part IV of the Court's opinion and would reverse the judgment of the District Court.

JUSTICE SCALIA, dissenting.

For the reasons I set forth in my opinion in *Franklin* v. *Massachusetts*, 505 U. S. 788, 823–829 (1992) (concurring in part and concurring in judgment)—and for an additional one brought forth in the briefing and argument of the present

---

[13] See *House of Representatives*, 525 U. S., at 349 (SCALIA, J., concurring in part) ("The prospect of this Court's reviewing estimation techniques in the future, to determine which of them *so obviously* creates a distortion that it cannot be allowed, is not a happy one").

case—I disagree with the Court's holding that appellants have standing under Article III of the Constitution to bring this suit.

As the Court acknowledges, in order to establish standing, appellants must show that the federal courts "have the power to redress the injury that the [federal appellees] allegedly caused [them]." *Ante,* at 459 (internal quotation marks omitted). Yet the Court does not dispute that, even if appellants were to succeed in their challenge and a court were to order the Secretary of Commerce to recalculate the final census, their injury would *not* be redressed "unless the President accepts the new numbers, changes his calculations accordingly, and issues a new reapportionment statement to Congress . . . ." *Franklin, supra,* at 824. That fact is fatal to appellants' standing because appellants have not sued the President to force him to take these steps—and could not successfully do so even if they tried, since "no court has authority to direct the President to take an official act," 505 U. S., at 826. As the Court acknowledged in *Franklin,* the President enjoys the discretion to refuse to issue a new reapportionment statement to Congress: "[H]e is not . . . required to adhere to the policy decisions reflected in the Secretary's report." *Id.,* at 799; see also *id.,* at 800. It displays gross disrespect to the President to assume that he will obediently follow the advice of his subordinates—in this case, a new report by his Secretary, recommending that he alter his prior determination. *Id.,* at 824–825 (SCALIA, J., concurring in part and concurring in judgment). Thus, because appellants' "standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 562 (1992) (internal quotation marks omitted), standing in this case does not exist.

The case for appellants' standing is even weaker than I described it in *Franklin.* Redress of their alleged injuries

depends not only on a particular exercise of the President's discretion, but also on the exercise of the unbridled discretion of a majority of 435 Representatives and 100 Senators (or two-thirds if the President does not agree), whom federal courts are equally powerless to order to take official acts.

Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Pursuant to that authorization, Congress has provided that, once the President transmits to Congress the decennial reapportionment statement that the statute requires, 46 Stat. 26, 2 U. S. C. § 2a(a), "[e]ach State shall be entitled, . . . until the taking effect of a reapportionment under this section or subsequent statute, to the number of Representatives shown in [that] statement," § 2a(b). Thus, the law provides only two means by which Utah's entitlement can be altered: "the taking effect of a reapportionment under this section or subsequent statute." *Ibid.* The first means refers to the next decennial census;[1] the second to a new law enacted in the interim. Thus, even if the President *wanted* to transfer one congressional seat from North Carolina to Utah, he could not do so before 2011 unless *Congress* enacted a new law authorizing such a reapportionment.

---

[1] It cannot be deemed to refer to reapportionment under the *new* Presidential statement that appellants seek, because "reapportionment under this section" pursuant to the 2000 census *has already occurred.* The Presidential statement effecting "reapportionment under this section" must be transmitted "[o]n the first day, or within one week thereafter, of the first regular session" of the first Congress after the census, § 2a(a)—a deadline met by the President's statement under challenge here, but now long since passed.

The Court no doubt realizes that it is not even conceivable that appellants could have standing if redress of their injuries hinged on action by Congress; accordingly, it is driven to assert that the law does not mean what it says. The statute, the Court argues, "do[es] not expressly say" what is to occur when the numbers the Secretary reported to the President are flawed; accordingly, because it "makes good sense" to do so, the Court reads into the statute a third means by which the reapportionment can be altered: judicially decreed "mechanical revision" of "a clerical, a mathematical, or a calculation error" in the Secretary's report. *Ante,* at 462. This is an astonishing exercise of raw judicial power. The statute says very clearly what is to occur when *anything* (including a clerical, mathematical, or calculation error in the Secretary's report) renders the completed apportionment worthy of revision: nothing at all, unless *Congress* deems it worthy of revision and enacts a new law making or authorizing the revision that *Congress* thinks appropriate. There was no reason for the statute to list "expressly" the infinite number of circumstances in which the reapportionment could *not* be altered by other means, because it expressly said that the States' "entitle[ment]" to the number of Representatives shown in the presidential statement *could* be altered *only by the two prescribed means.* There is simply no other way to read the governing text: that the States "shall be entitled" to the reapportionment set forth in the President's statement "until" one of two events occurs, undeniably means that *unless* one of those two events occurs the States remain "entitled" to the reapportionment. What a wild principle of interpretation the Court today embraces: When a statute says that an act can be done *only* by means $x$ or $y$, it can also be done by other means that "make good sense" under the circumstances, unless *all* the circumstances in which it cannot be done have been listed.

I would not subscribe to application of this deformed new canon of construction even if there were something about

"clerical error" that made it uniquely insusceptible of correction by the means set forth in the statute. But there is not. Indeed, what more plausible and predictable occasion for congressional revision could there be than the demonstration of an error in the reported census count? By taking the responsibility for determining and remedying that error away from Congress, where the statute has placed it, and grasping it with its own hands, the Court commits a flagrant violation of the separation of powers.

The Court can find no excuse in our precedents for today's holding. It relies on three of our cases in which it says we "found standing in similar circumstances," *ante*, at 464. They are similar as day and night are similar. Two of them, *Federal Election Comm'n* v. *Akins*, 524 U. S. 11 (1998), and *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252 (1991), are inapposite because redress of the plaintiffs' injuries did not require action by an independent third party that was not (and could not be) brought to answer before a federal court, much less by a third party for whom (as for the President) it would be disrespectful for us to presume a course of action, and much, much less in violation of the explicit text of a statute.[2] Although in the third case, *Bennett* v. *Spear*, 520 U. S. 154 (1997), we found standing to challenge the action of one agency (Fish and Wildlife Service) despite the fact that redress ultimately depended upon action by another agency (Bureau of Reclamation) not before the Court, we made it quite clear that we came to this conclusion only because in the matter at issue the one agency had the power to coerce action by the other: "[I]t does not suffice," we said, "if the injury complained of is the result of the *independent* action of some third party not before the court." *Id.*, at 169

---

[2] Moreover, in *Metropolitan Washington* there was no doubt that, if a court enjoined the challenged action, the injuries it allegedly caused would be redressed *automatically* by operation of law. See 501 U. S., at 265 (citing 49 U. S. C. App. § 2456(h)).

(internal quotation marks and brackets omitted). We found that, "while the [Service] theoretically serves an advisory function, in reality it has a powerful coercive effect on the action agency." *Ibid.* (internal quotation marks and citation omitted). In this case, by contrast, we simply cannot say— both because it is not true and because it displays gross disrespect to do so—that the action of the President is "coerced" by the Secretary. Not to mention, once again, the statute that explicitly leaves this question to Congress.

For these reasons, I would vacate the judgment of the District Court and remand with instructions to dismiss for want of jurisdiction.