# IN THE SUPREME COURT OF TEXAS

No. 19-0400

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

VICENTE MEDINA, ASHLEY MEDINA AND ARIS ANTONIOU,
RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

*~consolidated with ~*

No. 19-0401

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

MICHAEL A. BURNEY, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

*~consolidated with ~*

SAN JACINTO RIVER AUTHORITY, PETITIONER,

v.

CHARLES J. ARGENTO, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

JUSTICE BLACKLOCK, dissenting.

This Court held long ago that a dispute "is not a judicial question" if a court's "judgment would only amount to a declaration" that an unlawful act had taken place, which "might result incidentally in benefit . . . to some citizen" but is "not . . . enforced by any process issued from the court." *State v. Owens*, 63 Tex. 261, 266 (1885). This rule exists because Texas courts, including this one, exercise only "the *judicial power* of the state . . . ." TEX. CONST. art. V, § 3 (emphasis added). The judicial power does not include the authority to answer an "abstract question of law without binding the parties." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). Instead, the "judicial power" is the authority "of a court to . . . pronounce a judgment *and carry it into effect* between . . . parties who bring a case before it for a decision." *Morrow v. Corbin*, 62 S.W.2d 641, 644 (Tex. 1933) (emphasis added).

The "redressability" element of standing preserves these limitations on the judicial power. To establish a court's jurisdiction, the plaintiff must show that its alleged injury "will 'likely' . . .

2

be 'redressed by a favorable decision.'" *Heckman v. Williamson County*, 369 S.W.3d 137, 154–55 (Tex. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A "lawsuit does not fall within [the constitutional] grant of judicial authority unless, among other things, courts have the *power* to 'redress' the 'injury'" alleged by the plaintiff. *Utah v. Evans*, 536 U.S. 452, 459 (2002) (emphasis added).

Contrary to these well-established limitations on the judicial power, the Court's decision authorizes a statutory takings claim under Chapter 2007 of the Government Code even though a favorable judgment on that claim would do nothing to redress the plaintiffs' alleged injury. The alleged injury is the flooding of the plaintiffs' homes during Hurricane Harvey as a result of the San Jacinto River Authority's decision to release water from Lake Conroe. Years after the fact, that injury can only be redressed by monetary damages, and the plaintiffs have a claim pending in another lawsuit seeking takings damages through the normal channels. Chapter 2007, however, creates a unique statutory cause of action under which the courts have no authority to award damages. Instead, Chapter 2007 *requires* the courts, if the plaintiff prevails, to issue a judgment "rescinding" the taking. In this case, such a judgment would be nonsensical. The flooding of homes several years ago cannot be undone, so judicial "rescission" of the taking is a meaningless gesture that does nothing for the plaintiffs.

The most the plaintiffs could hope to achieve using Chapter 2007 is a free-floating judicial "finding" that the flooding of their homes was a taking by the SJRA resulting in damages in an amount identified by the court. They cannot use Chapter 2007 to actually obligate the SJRA pay that amount, which would be the only way to redress their injuries. Indeed, the judgment the plaintiffs seek would not require the SJRA to do or refrain from doing anything. The plaintiffs,

however, anticipate that the judgment's persuasive, precedential, or preclusive effect would help them obtain damages from the SJRA in the future, either in another lawsuit or by the SJRA's voluntary decision to pay. In other words, their Chapter 2007 claims invite the courts to "decid[e] a question . . . abstract in its nature . . . simply to be taken notice of and observed by all officers and citizens." *Ex parte Towles*, 48 Tex. 413, 436 (1877). This is precisely the sort of "extra-judicial question" that is not properly "a subject of legal adjudication." *Id.* at 437.

I would dismiss the Chapter 2007 claims for lack of jurisdiction. Although Chapter 2007 is not an appropriate vehicle for the plaintiffs' grievances, they are of course free to pursue their pending constitutional takings claims in the county court at law.

## I.

Standing—which consists of a concrete, particularized stake in the resolution of "a real controversy" capable of "be[ing] resolved by the court"—is a constitutional requirement for maintaining suit. *Heckman*, 369 S.W.3d at 154, 150. As a component of subject matter jurisdiction, standing "may be raised for the first time on appeal." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). Even where neither party questions standing, as here, courts are "duty-bound" to consider the issue *sua sponte* if in doubt. *Garcia v. City of Willis*, 593 S.W.3d 201, 206 (Tex. 2019).[1] Although this Court did not explicitly adopt the U.S. Supreme Court's standing jurisprudence until 1993, the principles animating the modern standing requirement in Texas courts are at least as old as the Texas Constitution. Our Constitution vests "the judicial

---

[1] Although the parties themselves did not raise standing, *amicus* the State of Texas briefed the issue thoroughly, and the plaintiffs had ample opportunity to respond to those arguments.

4

power" in the courts, art. V, § 1, and prohibits the judiciary from "exercis[ing] any power properly attached to either" the legislative or executive branches, art. II, § 1.[2]  This Court has defined the "judicial power" as the authority "of a court to . . . pronounce a judgment *and carry it into effect* between . . . parties who bring a case before it for a decision."  *Morrow*, 62 S.W.2d at 644 (emphasis added).  The "character stamped upon [the courts] by the Constitution" is that of arbiters of disputes "in which there are usually contesting parties; some valuable right recovered or adjudged; a judgment of record, *and execution to enforce it.*"  *Towles*, 48 Tex. at 433 (1877) (emphasis added).  To decide a case brought by a party without standing would constitute an impermissible "advisory" opinion, in that it would "address[] only a hypothetical injury" or "abstract question of law without binding the parties."  *Tex. Ass'n of Bus.*, 852 S.W.2d at 444.

Article III of the U.S. Constitution imposes an analogous standing requirement in federal courts.  *See Lujan*, 504 U.S. at 561.  This Court has adopted the standing criteria articulated by the U.S. Supreme Court as a means of evaluating litigants' standing under the Texas Constitution.  *Heckman*, 369 S.W.3d at 154.  To establish standing under this framework, a plaintiff must plead facts showing that (1) he or she has suffered, or is at imminent risk of suffering, a "concrete and

---

[2] This language has been part of the Texas Constitution since its ratification in 1876, and substantially identical vesting and separation-of-powers clauses appeared in all four of the State's previous constitutions since statehood in 1845.  Recognizing that "constitutional language . . . means to-day what it meant . . . when . . . adopted," *Travelers' Ins. Co. v. Marshall*, 76 S.W.2d 1007, 1012 (Tex. 1934), this Court has held that such language "must be interpreted in light of the historical context in which it was enacted," *Travelers Indem. Co. of Ill. v. Fuller*, 892 S.W.2d 848, 850 (Tex. 1995).  Historically informed interpretation is especially important to understanding a capacious constitutional "term[] ('The judicial Power' . . . ) that ha[s] virtually no meaning except by reference to . . . . the traditional, fundamental limitations upon the powers of . . . courts."  *Honig v. Doe*, 484 U.S. 305, 340 (1988) (Scalia, J., dissenting).  Although I believe modern standing case law requires dismissal of this case, Texas cases and other sources written prior to or contemporaneously with the Texas Constitution's adoption also support the conclusion that this case is outside our power to decide.  *See Towles*, 48 Tex. at 436 (1877) ("question[s] . . . abstract in [their] nature" are "extra-judicial" matters not properly the "subject[s] of legal adjudication"); 1 BENJAMIN VAUGHAN ABBOTT & AUSTIN ABBOTT, A TREATISE UPON THE UNITED STATES COURTS 186 (1869) ("determinations of the judicial power are limited to . . . determinations of . . . concrete *rights*, and cannot extend to purely abstract questions.").

5

particularized . . . injury"; (2) the injury is "traceable" to the defendant's challenged actions; and (3) the injury will "'likely' . . . be 'redressed by a favorable decision.'" *Id.* at 154–55 (quoting *Lujan*, 504 U.S. at 560–61). We often look to federal case law for guidance in applying these criteria. *Id.* at 152 n.60. Although this Court does not defer uncritically to the federal judiciary when interpreting the Texas Constitution, we afford respectful consideration to federal decisions to the extent they are "well-reasoned and persuasive." *Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992).

Redressability is the element of standing most clearly implicated in this case. This "concept has been ingrained" in American "jurisprudence from the beginning." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.5 (1998). A "lawsuit does not fall within [the constitutional] grant of judicial authority unless, among other things, courts have the *power* to 'redress' the 'injury'" alleged by the plaintiff. *Evans*, 536 U.S. at 459 (emphasis added). Indeed, the U.S. Supreme Court had described it as an "established . . . principle of constitutional law" prior to the Texas Constitution's adoption that a "[c]ourt . . . has no jurisdiction" over a dispute in which it is not "authorized by law" to issue a "mandate to carry into effect" its judgment. *Gordon v. United States*, 69 U.S. 561 (1864), *opinion reported*, 117 U.S. 697 (1885). To decide such a case would be to exercise a power not "judicial in its character." *Id.*; *accord McNulty v. Batty*, 51 U.S. 72, 79 (1850).

## II.

With these principles in mind, the question is whether a favorable judgment under Chapter 2007 can redress the plaintiffs' alleged injuries. This inquiry, like any question of statutory interpretation, depends on the statute's plain language. *See Entergy Gulf States, Inc. v. Summers*,

6

282 S.W.3d 433, 437 (Tex. 2009). "Time-honored canons of interpretation, both semantic and contextual, can aid interpretation." *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 84 (Tex. 2017). "Strictly speaking," however, the "canons" are "but grounds of argument resorted to for . . . ascertaining the true meaning of the law." *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004) (quoting *Mills County v. Lampasas County*, 40 S.W. 403, 404 (Tex. 1897)). However strong the desire to afford relief for deprivations of the fundamental right to property, such "policy concerns do[] not bear directly on . . . statutory-interpretation question[s]." *JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 490 (Tex. 2019). "Our job is to apply the statutory text as written, not as we would have written it." *Id*.

Chapter 2007 says that a property owner who prevails "is *only* entitled to, and the governmental entity is *only* liable for, invalidation of the governmental action . . . resulting in the taking." TEX. GOV'T CODE § 2007.023 (emphasis added). It further provides that a court "shall order [a] governmental entity to rescind" an action found to be a taking. *Id*. § 2007.024. Far from authorizing a court to award damages, this language negates the existence of such authority. "There is a difference between voiding" an official act "and seeking damages as a remedy for [that] act." *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995). The statute reflects a deliberate legislative choice to provide "only" for courts to order rescission/invalidation, not damages. Yet only damages can redress the injury that brings these plaintiffs to court.[3]

---

[3] Other claims do provide for damages that would redress the plaintiffs' injuries, such as an inverse-condemnation claim in county courts, which have exclusive jurisdiction over such claims. Indeed, the plaintiffs have just such a claim pending. *See Medina v. San Jacinto River Auth.*, No. 1123430 (Harris Co. Ct. at Law No. 1, Tex.). Their counsel explained at oral argument that they also pursued a duplicative claim under Chapter 2007 primarily

Unequivocal statutory language notwithstanding, the Court shrugs off concerns about redressability by claiming that rescission is not "the only remedy available to a prevailing property owner under [Chapter 2007]." *Ante* at __. Although the Court agrees that Chapter 2007 does not entitle the plaintiffs to monetary damages, it suggests that the statute nonetheless provides for redress of their injury by entitling them to two "findings:" (1) whether the government action was a taking and, if so, (2) the amount of monetary damages resulting from the taking. *Ante* at __.

Yes, the statute requires these findings, but the only relief a court may *order* on the basis of these findings is rescission of the taking. The court's judgment must "include a fact finding that determines the monetary damages [the plaintiff] suffered . . . as a result of the taking." TEX. GOV'T CODE § 2007.024(b). But this language provides for an *estimate*—not an award—of damages. That estimate comes into play only when a government defendant "*elect*[*s*] to pay the damages as compensation" to a prevailing property owner in exchange for a court's "withdraw[al] [of] the . . . order rescinding the governmental action" determined to be a taking. *Id.* § 2007.024(c), (d) (emphasis added). Under this peculiar framework, the court orders rescission of the taking but also identifies a dollar amount that the government may elect to pay in lieu of rescission, purely at the government's option. In no event does the statute empower a court to order payment of damages.[4] The defendant may choose between rescinding the taking and paying the damages

---

because "attorney's fees are recoverable under [the statute]" that are unavailable in inverse-condemnation actions. *See* TEX. GOV'T CODE § 2007.026(a). The desire to recover attorney fees is understandable, but it does nothing to establish the injury or redressability required for standing. *See infra* at ___. Contrary to the Court's suggestion, I do not contend that we should "dismiss the statutory claim merely on the possibility that the constitution may provide the desired remedy." *Ante* at __. I urge dismissal because the property owners lack standing in this case, and whether they have standing in this case in no way depends on what happens in county court.

[4] Even if a government defendant that elects to compensate a prevailing plaintiff rather than rescind the taking fails to pay within thirty days of when judgment is rendered (as the statute requires), a court remains powerless to

amount found by the court. When rescission is impossible, however, the court has no power to order the payment of damages, and the defendant has no obligation to pay them (or to do anything at all).

Without a judgment carrying their desired "findings" into effect, the plaintiffs have nothing but a piece of paper signed by a court containing pronouncements in their favor. They may hope to use these findings to redress their injury down the road by (1) convincing the SJRA to voluntarily pay damages, or (2) convincing *another* court to award a judgment of damages. But the findings themselves do not require their houses to be repaired or require the SJRA to compensate them. Redressability means "that the court [would] be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment).[5] Findings, without a judgment, are merely non-binding advisory declarations that do not redress any injury. It is only the judgment of rescission that gives this statutory scheme any real teeth. When rescission of the taking is

---

order payment, and instead must simply "reinstate the [rescission] order" it had "previously withdrawn." TEX. GOV'T CODE § 2007.024(d), (e).

[5] Neither the plurality decision in *Franklin*, 505 U.S. 788, nor the holding in *Evans*, 536 U.S. 452, are to the contrary. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 n.9 (10th Cir. 2005); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 959 (8th Cir. 2015). In both cases, the Court held that apportionment-related injuries would likely be redressed by ordering the Secretary of Commerce to modify census reports, even though it was the President's duty to transmit apportionment results to Congress. Redressability existed "as a *practical* matter," the Court said, because a court could order "the Secretary to substitute a new 'report' for the old one," at which point the "consequent apportionment-related steps would be purely mechanical." *Evans*, 536 U.S. at 460, 463 (emphasis added). Said otherwise, the plaintiffs in both cases sought court-orders directing a party to actually do something in the real world, "the *practical* consequence of [which]" would be "significant increase[s] in the likelihood" that the plaintiffs' injury would be redressed. *Id*. at 464 (emphasis added). Not so in this case, where the judgment the plaintiffs seek would not require anybody to do anything, and the plaintiffs' only hope is that their victory will either (1) induce the SJRA to voluntarily pay damages or (2) serve as the legal predicate for another court's award of damages. Neither pathway amounts to redressability.

9

impossible, a judgment under this statute requires nothing of the defendant and redresses no injury to the plaintiff. Nor would a judgment "invalidating" the flooding of homes have any effect. A naked declaration of the taking's "invalidity" requires nothing of the SJRA and affords nothing to the plaintiffs other than a judicial precedent they hope future courts will use as a predicate for awarding damages. Courts lack jurisdiction to award such toothless, ineffectual, abstract "relief."

The plaintiffs suggest that, apart from rescission or damages, they are entitled to a standalone judicial "determination" of "whether governmental actions result in a 'taking.'" The Court seems to share that view. *See ante* at __. If the idea is that this statute authorizes a court to award a declaratory judgment unaccompanied by any other form of relief, that is mistaken. The statute dictates that a "court's judgment in favor of a private real property owner . . . that determines that a taking has occurred *shall* order the governmental entity to rescind the governmental action . . . resulting in the taking." TEX. GOV'T CODE § 2007.024 (emphasis added). In other words, the legislature has dictated the content of a Chapter 2007 judgment in favor of a plaintiff, and the judgment must be one of rescission. *See id.* § 311.016(2) ("'Shall' imposes a duty."). The preceding statutory section, which entitles a prevailing property owner to "invalidation of the governmental action . . . resulting in the taking," *id.* § 2007.023, likewise can only be applied where rescission of that action is possible. *See id.* § 311.021 ("In enacting a statute, it is presumed that . . . a result feasible of execution is intended."). To comply with the legislature's direction, a court would have to order the SJRA, on pain of contempt, to "rescind" its 2017 release of floodwaters from Lake Conroe, millions of gallons of which flowed into the San Jacinto River

10

years ago. Such a nonsensical judgment, with which the SJRA cannot comply, would have no practical effect on either party and would not redress the plaintiffs' injuries.[6]

To be sure, the property owners might in some way benefit from a judgment containing the "findings" they seek, since that judgment's precedential or preclusive effect might aid them in their ongoing inverse-condemnation litigation against the SJRA. But a litigant's interest in a favorable judgment's possible precedential effect has never by itself been sufficient to confer standing.[7] If the prospect of "a favorable judicial precedent on an abstract legal issue" met "the requirement of redressability," parties could reliably bootstrap their way to standing by simply pointing to that possibility, and in doing so keep courts "busy indeed issuing advisory opinions" intended solely to serve "as precedent in subsequent litigation." *Hutchinson*, 803 F.3d at 958–59.

For similar reasons, a litigant's interest in a favorable judgment's possible preclusive effect, standing alone, has never been considered a cognizable interest for standing purposes. Since a dismissal for lack of standing is "a dismissal for lack of jurisdiction, and a court that has no jurisdiction cannot enter a judgment with preclusive effect . . . except on the issue of jurisdiction itself, it is circular to argue" that a plaintiff has standing by virtue of a favorable judgment's

---

[6] The statute's ineffectiveness when brought to bear against a taking that cannot be rescinded certainly limits its utility to property owners. But this result is plainly dictated by the text chosen by the legislature. Perhaps the statute's unusual structure—which gives government defendants the option to choose rescission or damages—reflects a legislative compromise between property-rights advocates seeking increased protection against takings and government agencies concerned about large damages awards. Whatever the reason, the statute says what it says, and we are not at liberty to depart from its plain language to vindicate what we perceive to be its "purpose." *See BankDirect Capital Fin.*, 519 S.W.3d at 86–87.

[7] *See Hutchinson*, 803 F.3d at 958–59; *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998) ("[M]ere precedential effect . . . is not, alone, enough to create Article III standing, no matter how foreseeable the future litigation."); *Milton v. Donovan*, 762 F.2d 1009 (6th Cir. 1985) (similar); *see also United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (noting that the prospect that "a favorable decision in this case might serve as a useful precedent . . . in a [subsequent] lawsuit . . . . cannot save this case from mootness.").

"preclusive effect, when it can have preclusive effect only if" the plaintiff has standing. *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chi.*, 701 F.2d 653, 656 (7th Cir. 1983); *see also United Servs. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 863–64 (Tex. 1965) (explaining that courts need jurisdiction in order to render judgment with preclusive effect).[8]

Nor could a court alleviate the constitutional defects in the plaintiffs' claims by issuing a judgment claiming to "rescind" or "invalidate" the taking despite the impossibility of that action. It is as much a principle of common sense as it is of constitutional law that a plaintiff has no standing to seek a judicial decree "to enjoin an event that has already fully occurred." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 621 (1st Cir. 1995). Redressability cannot be established where, as a practical matter, it is "impossible for the courts to redress the injury through the exercise of their remedial powers." *Fund for Animals v. Babbitt*, 89 F.3d 128, 133 (2d Cir. 1996). Here, "[n]o mandate that [a court] might issue can turn back the pages of the calendar and either stop" the SJRA's release of water from Lake Conroe "or fully palliate its effects." *CMM Cable*, 48 F.3d at 621. "There is no prospective remedy that can unring that bell." *Opala v. Watt*, 454 F.3d 1154, 1160 (10th Cir. 2006). Because an order to "rescind" or "invalidate" the purported taking in this case "would be ineffectual" and "could not possibly remedy" the property owners' "alleged harm," they "lack[] standing to seek such relief." *Meyers*, 548 S.W.3d at 488. The bottom line is that damages are the only relief that provides meaningful redress for these plaintiffs, and damages are simply unavailable under this statute.

---

[8] It is no answer to say that the property owners would have standing to seek damages (if the statute allowed for it) and thus must have all-purpose standing to seek declaratory or other remedies for their claims. On the contrary, a plaintiff "must demonstrate standing separately for each form of relief sought." *Heckman*, 369 S.W.3d at 155 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000)).

***

The plaintiffs nevertheless pin their hopes on the election-of-remedies provision, under which the government may choose to pay damages if it prefers that route to rescission of the taking. The plaintiffs "suspect [that] the prospect of public outcry and political fallout" from a court's finding that the 2017 release of water was an unlawful taking might pressure the SJRA into paying damages, even in the absence of a judgment making it do so. Respondent's Brief on the Merits at 37. Such optimistic speculation cannot establish redressability. "[I]t must be likely, as opposed to merely speculative, that the [plaintiff's] injury will be redressed by a favorable decision." *Heckman*, 369 S.W.3d at 154–55 (quoting *Lujan*, 504 U.S. at 561). The SJRA, far from signaling even the slightest willingness to pay compensation, condemns the plaintiffs' speculation about "political fallout" as "simply a threat that political pressure will compel . . . a political subdivision to pay damages the Legislature prohibited." Reply Brief on the Merits at 32–33. "This veiled threat," says the SJRA, "ought not to be tolerated." *Id.* at 33. Hardly the words of a defendant in a generous mood.

At any rate, even if the SJRA could reasonably be expected to voluntarily pay damages should the property owners prevail, redressability would still be lacking. Again, redressability means "that the court [would] be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in judgment). The federal courts of appeals have consistently so held.[9] Otherwise, "[i]f courts [could] simply assume that

---

[9] *See, e.g., Gandy*, 416 F.3d at 1159 ("it must be the effect of the court's judgment on the defendant"—not merely its persuasive power as a statement of law—"that redresses the plaintiff's injury."); *Lewis v. Gov. of Alabama*,

13

everyone . . . will honor the legal rationales that underlie their decrees, then redressability [would] *always* exist." *Id.* That logic cannot be squared with the "unvarying practice" of American courts "to render no judgments not binding . . . on the parties." *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113–14 (1948).

As the U.S. Supreme Court explained in 1864, courts are without power to decide disputes in which they are not "authorized by law . . . to carry into effect the[ir] judgment[s]." *Gordon*, 69 U.S. 561. A court in such a case "could merely express an opinion, which . . . binds no one, is no judgment in the legal sense of the term," and is therefore not within the "judicial power . . . granted by the Constitution." *Id.*[10] This Court has similarly remarked that standing requires a "non-abstract question of law that, if decided, would have *a binding effect on the parties*." *Heckman*, 369 S.W.3d at 147 (emphasis added). A dispute "is not a judicial question" if a court's "judgment would only amount to a declaration" that an unlawful act had taken place—which "might result incidentally in benefit . . . to some citizen, but it is not . . . enforced by any process issued from the court." *Owens*, 63 Tex. at 266 (1885).

---

944 F.3d 1287, 1305 n.19 (11th Cir. 2019) (en banc); *Hutchinson*, 803 F.3d at 958–59; *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1202 (D.C. Cir. 1996); *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010).

[10] *Accord Hayburn's Case*, 2 U.S. 408, 410 n* (1792) (for a court to render a decision subject to "revision and control . . . . by an officer in [another] department" would be "radically inconsistent with . . . that judicial power" conferred "by the constitution"); *McNulty*, 51 U.S. at 79; *In re Pac. Ry. Comm'n*, 32 F. 241, 256 (C.C.N.D. Cal. 1887) (Field, J.) (For a dispute "[t]o come within th[e] description" of "judicial" power, "[t]here must be parties to come into court, who can be reached by its process, and *bound by its power*; whose rights admit of ultimate decision by a tribunal *to which they are bound to submit*.") (emphasis added) (quoting 10 ANNALS OF CONG. 606 (1800) (statement of Rep. Marshall)); *Underwood v. McDuffee*, 15 Mich. 361, 368 (1867) ("The judicial power . . . involves the power to '*hear and determine*' the matters to be disposed of; and this can only be done by some order . . . which needs no additional sanction . . . to be enforced. No action which is merely preparatory to an order . . . rendered by some different body, can be properly termed judicial . . . . It is the inherent authority not only to decide, but to make binding orders or judgments, which constitutes judicial power.").

Here, a court's estimate of damages suffered by the property owners would amount, at most, to a *recommendation* that the SJRA compensate them. The case law on that point is clear: a recommendation, no matter how persuasive or well-reasoned, does not partake of the "judicial power." That the SJRA would be free to "completely disregard [a] judgment" that the property owners are owed compensation demonstrates that "the courts [a]re not authorized to render" such judgment in the first place. *Waterman*, 333 U.S. at 113–14. To do so would be to "decid[e] a question . . . abstract in its nature, because not enforced by [the courts], . . . simply to be taken notice of and observed by all officers and citizens." *Towles*, 48 Tex. at 436 (1877). This sort of "extra-judicial question" is not properly "a subject of legal adjudication." *Id.* at 437.

\*\*\*

The Court's principal response to these concerns is to observe that "the Legislature . . . has waived immunity to suit and liability for statutory takings" and so the fact "[t]hat [the SJRA] might decline to pay damages is no reason to dismiss the pending suits on jurisdictional grounds." *Ante* at __. The first statement is true but irrelevant; the second is relevant but not true. As for the former, the State's consent to suit eliminates sovereign-immunity obstacles to the property owners' claims, but that has nothing to do with whether their claims meet the entirely separate constitutional requirement of standing, which the legislature cannot waive. *See Morrow*, 62 S.W.2d at 646 ("Since advisory jurisdiction . . . is not given" to courts "under the Constitution," it "cannot be conferred by the Legislature").

The Court's other assertion—"[t]hat [the SJRA] might decline to pay damages is no reason to dismiss the pending suits on jurisdictional grounds"—is simply wrong, for the reasons already explained. The fact that a judgment for the property owners would leave it entirely up to the SJRA

15

whether to take the only action (paying damages) capable of remedying the plaintiffs' injuries is *absolutely* a "reason to dismiss the[se] . . . suits on jurisdictional grounds." The nonbinding nature of such a "judgment" means redressability is lacking, which means the courts lack jurisdiction.

The Court also points to the legislature's ability to waive immunity from *suit,* but not from *liability*, thereby allowing a party to obtain a damages judgment against the government but not to collect on it unless the legislature appropriates money to pay it. *See Fed. Sign v. Tex. So. Univ.,* 951 S.W.2d 401, 414 (Tex. 1997) (Hecht, J., concurring). The Court warns that my position "would nullify" these "many legislative grants of permission to sue, as any resulting suit against the government would fail the . . . redressability test if the government retains immunity from liability." *Ante* at __.[11]

The Court's warning is misplaced. There is a critical difference between money judgments against the government that require appropriation before they can be collected and any "judgment" a court might render for the property owners under Chapter 2007. The former adjusts the parties' legal rights, while the latter does not. The difference is tied to a provision of the Texas Constitution that prohibits the legislature from "grant[ing], by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same

---

[11] The Court also worries that a "suit against the government would fail" my conception of the "redressability test if the government" merely "*limits* collectability or enforcement of a judgment" rather than foreclosing collection or enforcement altogether. *Ante* at __ (emphasis added). True, the legislature sometimes limits the damages that may be awarded to plaintiffs suing governmental entities. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 101.023 (Texas Tort Claims Act). But the fact that such limited damages may not *fully* redress a plaintiff's injuries does not deprive him of standing to sue to recover them. A court's ability "to effectuate a partial remedy" satisfies the redressability requirement. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)). The difference here is that Chapter 2007, unlike the Tort Claims Act, does not afford partial redress to these plaintiffs. It affords them no meaningful redress at all.

16

shall not have been provided for by pre-existing law." Art. III, § 44. This provision has been "interpret[ed] . . . to mean that the Legislature cannot appropriate state money to 'any individual' unless . . . there is already in force . . . a legal and valid obligation of the state . . . . as would form the basis of a judgment against [it] . . . in the event it should permit itself to be sued." *Austin Nat. Bank of Austin v. Sheppard*, 71 S.W.2d 242, 245 (Tex. 1934). A "mere moral obligation," on the other hand, will *not* "support an appropriation of state money to an individual." *Id.*[12]

Thus, when immunity from suit is waived but immunity from liability is not, a court's judgment for a plaintiff, even if uncollectable without an appropriation, nonetheless establishes the government's legal obligation to pay the plaintiff, which in turn enables the legislature to make an otherwise constitutionally forbidden appropriation to the plaintiff.[13] By contrast, a judgment under Chapter 2007—which would put the SJRA to the false "choice" of "rescinding" a flood or paying damages—imposes no legal obligations and would change nothing about the parties' legal status. By its own terms, the judgment would be entirely incapable of execution. It would amount at most to a *moral* obligation on the SJRA, which stands in contrast to the *legal* obligation imposed on the government by money judgments.

---

[12] *See also State v. Wilson*, 9 S.W. 155, 157 (Tex. 1888); *Lindsey v. State*, 811 S.W.2d 731, 734 (Tex. App.— Austin 1991, writ denied) (plaintiffs' "claim [wa]s not one 'provided for by pre-existing law' within the meaning of article III, section 44" because "[a]lthough the relevant [statutes] imposed certain duties on the State, they did not expressly obligate the State to pay the [plaintiffs'] claim for damages"); 67 TEX. JUR. *State of Texas* § 69 (3d ed. 2021 update).

[13] Strictly speaking, although Article III, § 44 prohibits only appropriation "of money out of the Treasury *of the State*" to pay claims not "provided for by pre-existing law" (emphasis added), a similar prohibition has been held applicable to political subdivisions (such as the SJRA) by virtue of two other constitutional provisions prohibiting the legislature from "mak[ing] any grant or authoriz[ing] the making of any grant of public moneys to any individual, association," or "corporation[] whatsoever"; and from "authoriz[ing] any . . . political . . . subdivision of the State . . . to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever." Art. III, §§ 51, 52. *See Tompkins v. Williams*, 62 S.W.2d 70, 71 (Tex. Comm'n App. 1933, judgm't adopted); *see also State v. City of Austin*, 331 S.W.2d 737, 742 (Tex. 1960).

The Court's remaining arguments for writing off redressability concerns are similarly unavailing. It points to Section 2007.006(a), which reads, "[t]he remedies provided by [Chapter 2007] are in addition to other procedures or remedies provided by law." This language, however, does not itself provide for any such "other" remedies. Instead, it merely clarifies that relief otherwise available under law is not displaced by Chapter 2007, and the plaintiffs do not cite any other provision of law that would entitle them to damages here. The Court also considers it significant that Section 2007.006(a) refers to the "remedies"—plural—"provided by [Chapter 2007]." But this phraseology is simply a recognition that the statute's election-of-remedies provision contemplates rescission as well as damages as potential remedies for a taking. Crucially, as explained above, it is only rescission that a court may *order*, while damages are available only at a government defendant's option. The statute's reference to multiple "remedies" does nothing to solve the redressability problem. The Court also points out that prevailing property owners are entitled under Subchapter B to awards of attorney fees and costs. *See* TEX. GOV'T CODE § 2007.026(a). A plaintiff's "interest" in recovering expenses incurred in litigation, however, is not sufficient to establish standing to litigate the underlying claim. As the U.S. Supreme Court has explained, "the mere fact that continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself" does not give rise to standing. *Diamond v. Charles*, 476 U.S. 54, 70–71 (1986).

### III.

No matter how sympathetic these property owners' predicament may be, the "doctrine of standing is a crucial and inseparable element" of the "separation of powers . . . . , whose disregard will inevitably produce . . . an overjudicialization of the processes of self-governance." Antonin

18

Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 881 (1983). The plaintiffs cannot demonstrate that the injuries they suffered during Hurricane Harvey "will 'likely' . . . be 'redressed by a favorable decision'" on their Chapter 2007 claims. *Heckman* 369 S.W.3d at 154–55 (quoting *Lujan*, 504 U.S. at 560–61). Their statutory takings claims should be dismissed while their constitutional takings claims move forward in county court.[14] Because the Court does otherwise, I respectfully dissent.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** April 16, 2021

---

[14] The Court speculates that because the "taking defined by [Chapter 2007] is broader than that cognizable under the constitution, . . . the remedy the statute provides may be all that is available to some of the property owners in these suits." *Ante* at __. But the possibility that some injuries might theoretically go un-redressed does not affect the standing inquiry. "The fact that there is no remedy for an injury . . . cannot justify . . . the judiciary, in overstepping the boundary of its prescribed authority, for the purpose of furnishing a remedy." *Hous. Tap & B. Ry. Co. v. Randolph*, 24 Tex. 317, 343–44 (1859); *see also United States v. Richardson*, 418 U.S. 166, 179 (1974); 1 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 143–44 (1835) ("It is true that . . . the judicial censureship . . . exercised by the courts of justice over the legislation cannot extend to all laws . . . , in as much as some of them can never give rise to that exact species of contestation which is termed a lawsuit . . . . The Americans have often felt this disadvantage, but they have left the remedy incomplete, lest they should give it an efficacy which might in some cases prove dangerous."). While it has long been said that the law ought to afford "a remedy for every wrong," that "maxim . . . presupposes a perfection in government that has not yet been reached." *Towles*, 48 Tex. at 428–29 (1877). "If a wrong has been done, the usurpation of the power to prescribe a remedy would be a still greater wrong." *Harrell v. Lynch*, 65 Tex. 146, 151–52 (1885).